**Barbara C. Balfour, Plaintiff-Appellant, v. Robert L. Balfour, Defendant-Appellee.**

**Gen. No. 11,200.**

Second District, First Division.
March 3, 1959.
Released for publication March 20, 1959.

Albert L. Daniels, of Chicago (George B. Collins, of counsel) for plaintiff-appellant.

Willard E. Cain, of Wheaton (Robert B. Bennorth, of counsel) for appellee.

JUSTICE McNEAL delivered the opinion of the court.

This is an appeal from a decree dismissing plaintiff's complaint for divorce for want of equity. In her verified complaint Barbara C. Balfour alleged that her husband, Robert L. Balfour, had been guilty of extreme and repeated cruelty toward her on July 22, August 1, and November 18, 1957. Defendant filed a verified answer in which he denied the allegations of cruelty and alleged that plaintiff had committed adultery with two men known to defendant. The two men were named at the trial before the court, and defendant's answer was amended accordingly. Plain-

tiff filed no reply to the affirmative matter in defendant's answer.

Appellant contends that three basic questions are presented for review, viz.: (1) Did the trial court err in denying plaintiff a divorce on clear evidence of three corroborated acts of cruelty? (2) Can the recriminatory defense of adultery be proven by "defendant's uncorroborated testimony to uncorroborated confessions of uncorroborated adultery by the plaintiff?" and (3) Did the trial court err in considering the claim of privilege by two defense witnesses as evidence against the plaintiff?

The parties were married on April 10, 1942, and as a result of the marriage two children were born—a daughter aged fourteen years and a son ten years of age. Plaintiff testified that on July 22, 1957, about 9:00 or 9:30 in the evening, the parties were at their home in Wheaton. She decided to drive over to her sister's home in Joliet. She took the car keys and told defendant she was going over there. He followed her out to the driveway and said she could not go. She replied that she would go if she wanted to. He twisted her arm and hit her, bruising her arm and blackening her left eye. Her father, Clarence Curtis, arrived on the scene. He testified that plaintiff and defendant were struggling, he separated them, and took his daughter to her sister's home in Joliet. Defendant testified that during the evening of July 22 he had conferred for an hour and a half with his wife's parents in the office of Dr. C. B. Wyngarden, and there stated that his wife had been keeping company with Dr. O'Hair, a dentist. He returned home about 9:00 o'clock and told his wife that he had just finished the conference with her parents and had told them the facts as she had given them to him. His wife became hysterical and said that she hated him for telling her parents. She ran into the bedroom,

grabbed the car keys and started out the back door toward the garage. He followed her out of the house and about midway between the house and the garage he took her hand and twisted it until the car keys dropped. He said that he took the keys from her because on a previous occasion she had attempted to take her life by throwing herself from the car and she was so hysterical that it would have been dangerous for her and other people on the road for her to drive the car that night; and that he did not strike her, but did what he did in order to save her own life.

On August 1, 1957, plaintiff and defendant, their children, and her parents attended a Pony League game where their daughter was a candidate for Pony League Queen. Plaintiff testified that while they were in the stands defendant commenced to argue with her. She and her parents got up and walked to the place where the cars were parked. She got in her father's car. Defendant said that she could not go with her father, but had to ride with defendant. He twisted her arm and pulled her half way out of the car. Her father tried to stop defendant, her mother stepped between plaintiff and defendant, and he pushed her mother against the car and hurt her back. Plaintiff locked the door on the car and her father took her to his home. Plaintiff's mother, Viola Curtis, testified that when defendant was pulling her daughter out of the car, Mr. Curtis attempted to restrain defendant. Mrs. Curtis ran between Mr. Curtis and defendant, and he shoved her, causing her hip to hurt. Curtis drove his car away with his daughter as a passenger, but left Mrs. Curtis standing there. She admits that she knocked defendant's glasses off with her pocket book. Defendant's version of this event is that he was called out behind the stands by Mr. Curtis, who told him that he was not going to stand for defendant's treatment of the plaintiff. They returned to the stands

and the Balfour and Curtis families decided to leave the game. Plaintiff got in her father's car. Defendant protested that he had brought plaintiff to the game and would take her home. He took his wife's arm to help her out of the car, but she did not desire to be helped. Defendant pulled her arm and Mrs. Curtis came at him swinging a handbag and knocked his glasses off onto the ground. Defendant denied that he pushed Mrs. Curtis. He testified that he followed his wife and her father to Joliet, and at the city limits defendant honked his horn. Both cars stopped. Defendant got in Mr. Curtis' car and a very friendly conversation was had for about thirty minutes. Plaintiff and her father did not deny that this friendly conversation occurred shortly after the controversy at the Pony League game. It does not appear that Mrs. Curtis was present at the time of this friendly conversation.

During the evening of November 17, 1957, there were repeated telephone conversations between defendant's daughter and some giggling youngsters at the other end of the line. About ten or eleven p. m., the phone rang again and the daughter answered. Defendant grabbed the phone and said "Will you get off the damn phone." Plaintiff protested that defendant should not swear into the phone to his daughter's friends, and an argument ensued. He told her that he was the ruler of the house—like a captain rules his ship, and that she should not interfere. The argument continued until about 12:30 a. m. on November 18, when he said: "Damn you, shut up," and threw her against the wall, hurting her right shoulder. Plaintiff's father and mother testified that their daughter told them on November 18 that defendant had pushed her against the wall. Her mother said that plaintiff displayed a bruise on her shoulder. Defendant says that when he grabbed the phone and spoke into it,

594

his daughter said "You cannot talk that way—I'll not have you . . . ," and he slapped her arm. He denies that he struck or pushed his wife against the wall. He denied that he struck his wife on any of the occasions alleged, but he admitted that he struck her on one occasion not alleged. When she told him she was in love with Dr. O'Hair, defendant remarked that she would either have to love him or leave him. Plaintiff slapped defendant's face and he automatically slapped her cheek.

On the morning of November 18 plaintiff was in bed when defendant took his daughter to the school bus. When he returned from work that day his mother-in-law, Mrs. Curtis, was preparing dinner. She said that plaintiff was not feeling well and would spend the night at her parents' home. Defendant telephoned his wife to inquire whether she wanted a doctor or medicine. On November 19 defendant returned from his work about 6:30 p. m. and found that Mr. and Mrs. Curtis were dinner guests. About 8 o'clock the complaint for divorce and restraining order were served. When defendant asked his wife how she could make such false claims against him, she referred him to her lawyer.

In announcing his decision the trial judge reviewed the evidence pertaining to the alleged acts of cruelty and then stated: "Now, if this had been an uncontested divorce case, the plaintiff would have made out at this point a prima facie case for divorce." From this statement appellant contends that the court must have denied plaintiff relief on the basis of defendant's evidence relative to plaintiff's alleged adultery. According to the abstract, the judge also said: "There are, however, a number of variations in the testimony. The defendant denies some things and explains some of the actions, especially the two acts of cruelty in July and November . . . . Then we get down to

the question of whom is the court going to believe," and concluded that "it is the opinion of the court that the plaintiff has not proved her case by a preponderance of the evidence as to the acts of cruelty involved." Nevertheless, irrespective of the particular reasons given by the trial judge, the question on review is whether the decision of the trial judge was correct.

The rule is well established in Illinois that the "extreme and repeated cruelty" that is ground for a divorce must be grave and endanger life or limb, or at least subject the person to danger of great bodily harm. Slight acts of violence by either spouse are not extreme cruelty within the statute authorizing divorce on such grounds. Coolidge v. Coolidge, 4 Ill. App.2d 205, 217. It was not the intent of the legislature, as construed by courts of review of this state, that a spouse should be able to sever the marriage relation by such slight acts as were here adduced in evidence. The charge of cruelty is a serious one which must be clearly proved.

After a careful examination of the record we are not convinced that the evidence respecting cruelty is either clear or corroborated, as suggested by appellant. Although plaintiff's father was present at the struggle in July and separated the participants, it is significant that he made no reference in his testimony to indicate that defendant hit the plaintiff and blackened her eye. The episode at the Pony League game, considering that defendant was outnumbered three to one and that three of the participants were shortly engaged in a very friendly discussion, as well as defendant's effort in November to reestablish himself as the captain of the Balfour household, fall far short of showing acts endangering plaintiff's life or limb.

Although the Supreme Court has said that there is no rule requiring corroboration of plaintiff's

testimony in a case such as this (Surratt v. Surratt, 12 Ill.2d 21, 23), where a cause is heard by a chancellor without a jury, his findings of fact are entitled to the same weight as the verdict of a jury, and this court is guided by the same principles as would apply had there been a verdict of a jury. In the instant case the trial court was in a position to observe the conduct of the witnesses and their demeanor while testifying, to determine their credibility, and to weigh the evidence and to determine the preponderance thereof. Cline v. Cline, 12 Ill.App.2d 231, 235. Upon the issues presented by plaintiff's complaint and defendant's answer thereto, the trial court found that plaintiff had not proved her case by a preponderance of the evidence as to the acts of cruelty involved, and dismissed her complaint for want of equity. This finding is supported by the evidence in the record and is not clearly and manifestly against the weight of the evidence. Under such circumstances a court of review will not disturb a finding of facts thus made. Fox v. Fox, 9 Ill.2d 509, 517; Long v. Long, 15 Ill.App.2d 276, 282; Baker v. Baker, 6 Ill.App.2d 557, 560. The trial court did not err in denying plaintiff a divorce.

In view of our conclusion that the trial court properly dismissed plaintiff's complaint for want of equity, the other two questions submitted by appellant need not be decided. For the reasons indicated the decree of the Circuit Court of Du Page County is affirmed.

Affirmed.

SPIVEY, P. J. and DOVE, J., concur.