Central National Bank & Trust Company of Peoria, Administrator of the Estate of John J. Heitzman, Deceased, Opal Heitzman and Margaret Einfeldt, Plaintiffs-Appellants, v. Central Illinois Light Company, a Corporation, Defendant-Appellee.

Gen. No. 64–82.

Third District.

November 30, 1965.

Rehearing denied January 4, 1966.

Cassidy & Cassidy, of Peoria (John E. Cassidy, Sr., of counsel), for appellants.

O'Hern, O'Hern & Wombacher, of Peoria, for appellee.

HOFFMAN, J.

This is a suit brought by landowners for damages to real and personal property occasioned by an explosion caused by a leak in an underground gas main of the defendant utility company. The defendant admitted liability. The only issue before the Court, which tried the case without a jury, was the amount of plaintiffs' damages.

On January 16, 1957, in Peoria, the residence of John J. Heitzman, now deceased, his nearby combined apartment and store building, and a garage, with the personal

property located therein, were totally destroyed by an explosion of defendant's gas main. Subsequently, plaintiffs received the full amount of the fire insurance coverage of $86,600 and the further sum of $50,000 from the sale of the vacant land upon which the buildings had been constructed. The plaintiffs, feeling that their damages exceeded this recovery, brought suit against the defendant company, and they claim that their evidence establishes a net building loss of $133,000 (being a valuation of the total real estate at $183,000 less $50,000, the value of the vacant land remaining), plus a loss of personal property in the sum of $19,324.05. They argue that this claim should not be reduced by the $86,600 received from the insurance company. Plaintiffs also ask for 5% interest on the amount claimed, annually from the date of the explosion, due to defendant's vexatious delay in payment.

In March, 1957, at the time plaintiffs settled with their insurance company and received their policy limits, they signed the usual and customary subrogation receipts, setting over unto the insurance company "all of the rights, claims and interests which the undersigned may have to any person or corporation liable for the loss . . . and authorize said insurance company to sue, compromise, or settle in the undersigned's names or otherwise all such claims and to execute and sign releases. . . ." Subsequently, on September 16, 1957, the defendant paid the sum of $43,300 to plaintiffs' insurance company and in return therefore the insurance company sold, transferred and assigned to the defendant "all right, title and interest" which said insurance company had acquired under and by virtue of the subrogation receipts executed by plaintiffs.

Thereafter, the cause was tried and the court found plaintiffs' damages to be $65,797.21, being $60,000 for loss of buildings and $5,797.21 for loss of personalty. The court then proceeded to hold that the defendant was

entitled "to credit or set-off in the amount of $86,600 against the amount of damages of the plaintiffs . . . of $65,797.21. . . ." As a result, the court then ordered that plaintiffs take nothing by their suit and entered judgment in bar of any right of recovery by plaintiffs. From this order plaintiffs take this appeal.

Plaintiffs' theory upon appeal is that the finding of total loss in the sum of $65,797.21 is manifestly against the weight of the evidence and, in fact, rests upon incompetent evidence. Plaintiffs further argue that they are entitled to 5% interest for vexatious delay in payment and that the setoff allowed defendant is inequitable and insupportable in fact or law.

The first problem presented by this appeal is the question of whether or not the trial court's finding of plaintiffs' damages in the total sum of $65,797.21 is proper.

The apartment and store building consisted of three stores on the sidewalk level and two 6-room apartments on the second floor. The three stores were occupied by a grocery store at a monthly rental of $125, a beauty shop at $60 and a hardware store at $60. Each apartment rented for $75 per month. The residence was a two-story brick building. The garage was a concrete block building containing 6 partitioned one-stall garages. The claim for personal property is for articles of the deceased owner which were in the residence at the time of the explosion.

■ ■ With regard to the trial judge's findings on damages, both parties to this appeal agree upon the rules of valuation applicable, and, in fact, both cite the same authorities. These rules are: for real estate, the correct measure of damages is the difference in value immediately before and immediately after the occurrence. Dixon v. Montgomery Ward & Co., 351 Ill App 75, 114 NE2d 44; Clark v. Public Service Co. of Northern Illinois, 278 Ill App 426. For personal property, which is destroyed, the measure of damages is the value or reason-

able worth at the time and place of its destruction. New York, C. & St. L. R. Co. v. American Transit Lines, Inc., 408 Ill 336, 97 NE2d 264.

To establish the valuation of the real estate under the rule above cited, the plaintiffs relied upon two witnesses: Russell Manning and John Erickson. The defendant relied upon witness John Manning. It is necessary to examine their testimony to decide whether or not the trial judge's determination of the real estate loss was manifestly against the weight of the evidence.

Russell Manning testified that he was a general contractor, and, in one form or another, had been engaged in the construction business in Peoria for 37 years. He estimated that he had built more than 100 commercial buildings in Peoria. He detailed his experience in estimating costs for a new building, and stated that for more than 17 years he had been familiar with the fair market value of Peoria real estate. He testified to his acquaintance with the buildings in question and to the neighborhood involved. He gave as his opinion that the fair cash market value of the real estate prior to the explosion was $183,000. He stated that he arrived at this conclusion by figuring square foot valuation, and replacement value. He added in an architect's fee of $7,135. He further said that the buildings were in such good shape that he allowed no dollar depreciation in computing their fair cash value. On cross-examination Manning testified: "I would have to have the replacement cost. That would be the only way I would arrive at a fair cash value." He further admitted that he was not a realtor and did not claim any experience as an appraiser or in fixing market value of improved city real estate.

John Erickson, plaintiffs' other valuation witness, testified that he was a graduate architectural engineer and vice-president of a Peoria firm of general contractors. He further stated that for the past ten years he had had

the sole responsibility for all of his company's estimates and bid work, that he had made many binding offers to build and was familiar with prices for material and labor in January, 1957. He estimated that between 1950 and 1957 he had the sole supervisory responsibility over 25 to 30 new commercial and industrial buildings his company constructed in Peoria. He finally testified that after the explosion at the request of the decedent owner's administrator, he personally investigated the building site, that he familiarized himself with the buildings' construction, and then presented to the administrator an itemized replacement cost of the three buildings, which totalled the sum of $135,680. Plaintiffs' counsel stated that Erickson's testimony was only offered to corroborate the previous testimony of Russell Manning who had used replacement costs as one factor in reaching his (Manning's) opinion of value.

Defendant's witness John J. Manning, who was no relation to Russell Manning, was a local realtor of 28 years' experience. He stated that he had participated in over $100,000,000 worth of real estate sales and had appraised over $200,000,000 worth of real estate. He further stated that each year he appraised over 500 homes. He testified to personal familiarity with the real estate in question, detailing that he had been through the property prior to the explosion. He then testified that in his opinion the loss was $56,500, being the value of $76,500 prior to destruction, less the value of the remaining land, which he fixed at $20,000. He pointed out that the sale of the bare land 3½ years after the explosion for $50,000 was not unusual for it was purchased for a "special use" by an oil company. (Incidentally, the administrator in the Federal Estate Tax return valued the bare land after the explosion at $15,000.)

██ ██ Based upon the above evidence, we are asked by the appellant to overturn the trial court's finding of

real estate damages in the sum of $60,000. It is basic that the trial court's findings of fact cannot be disturbed unless they are against the manifest weight of the evidence. Balfour v. Balfour, 20 Ill App2d 590, 156 NE2d 629. Nor may we, except in such circumstances, substitute our opinion as to the facts. Rude v. Seibert, 22 Ill App2d 477, 161 NE2d 39. The trial judge heard and saw the witnesses. Obviously, he chose to believe and to rely upon the evidence given by defendant's realtor rather than plaintiffs' contractors. Obviously, he placed greater faith in the judgment of an experienced appraiser and seller of real estate than in the opinions of contractors who deal in construction costs and have little knowledge of secondhand building values. The trial judge's judgment of real estate damages is based upon competent and persuasive evidence. Under the rules we may not set it aside.

Concerning the value of the lost personal property, the plaintiffs' sole evidence on this point was the testimony of the decedent's widow. She was permitted to introduce a long list of personal items which were destroyed along with the residence, and the separate replacement cost of each. She freely admitted that she had made no allowance for the age or condition of this property. Later, it was stipulated that her figures were her idea of fair market value. Defendant, to oppose this testimony, produced a witness who was the owner and operator of a furniture company, and who testified to many years experience in buying, selling and dealing in household furnishings and equipment, both new and used. He testified to a fair market value of the property upon the widow's list which was substantially below her value. His testimony was not contradicted.

Once again, we are asked to overturn the trial court's judgment on value. We cannot do this. It is obvious that the trial judge chose to rely upon the evidence produced by a dealer in personal property rather than that of the

widow who admitted she did not know the fair market value of the items involved.

The next question to be decided is whether or not the trial court properly allowed a setoff, against the judgment, of the sum paid plaintiffs by their insurance company.

█ If an insurer pays a loss which is due to the wrongful act of another, the insurer is subrogated to the rights of the insured, and may, in the name of the assured, for his use, prosecute a suit against the wrongdoer and reimburse himself. This is a rule independent of contract. Egan v. British & Foreign Marine Ins. Co., 193 Ill 295, 61 NE 1081; Standard Industries, Inc. v. Thompson, 19 Ill App2d 319, 152 NE2d 500.

█ This common law concept of subrogation originated in equity and is designed to place the ultimate responsibility for a loss upon the one on whom in good conscience it ought to fall, and to reimburse the innocent party who is compelled to pay. Geneva Const. Co. v. Martin Transfer & Storage Co., 4 Ill2d 273, 122 NE2d 540.

█ However, if an insured, who has previously received payment of a loss from an insurer, as in the instant case, obtains a recovery against a wrongdoer, the insured must account to the insurer. Pontiac Mut. County Fire & Lightning Ins. Co. v. Sheibley, 279 Ill 118, 116 NE 644.

█ Thus, when plaintiffs received the sum of $86,600 from their insurance company, and gave the company the customary subrogation receipt above set forth, they set over to the insurance company a first and prior claim upon any recovery from defendant to the extent of the payment ($86,600). From that point on, plaintiffs had no call upon the first $86,600, and the suit they filed was for the benefit of their insurance company for the first $86,600. What the insurance company did with this claim is of no consequence or importance to plaintiffs.

Thus, the claim of plaintiffs to not have the judgment of $65,797.21 subject to the setoff of $86,600 is of no basis. Accordingly, we hold that the trial judge correctly permitted the setoff.

In the view which we have taken of this case, the plaintiffs' complaint that they should receive 5% interest because of defendant's vexatious delay in payment is moot.

The judgment of the trial court is affirmed.

Judgment affirmed.

ABRAHAMSON, P. J. and DAVIS, J., concur.