STATE FARM GENERAL INSURANCE COMPANY, As Subrogee of Vito DeFrancesco, Plaintiff-Appellee, v. NANCY STEWART, Defendant-Appellant (Hartford Insurance Company of Illinois, Defendant).

First District (3rd Division)   No. 1—94—3161

Opinion filed May 21, 1997.

COUSINS, P.J., dissenting.

Michael W. Rathsack, of Chicago, for appellant.

Gary P. Hollander, of Bixby, Lechner & Potratz, P.C., of Chicago, for appellee.

JUSTICE GORDON delivered the opinion of the court:

Vito DeFrancesco contracted to sell an apartment building located in Cicero, Illinois, to defendant Nancy Stewart. After DeFrancesco delivered the deed to and possession of the premises to Stewart, but before Stewart paid him the full contract price, the building was destroyed by fire. Both Stewart and DeFrancesco submitted claims to their respective fire insurance carriers, and both collected insurance proceeds for the loss of the subject property. Plaintiff State Farm General Insurance Co. (State Farm General), DeFrancesco's insurer, brought this action against Stewart as a purported subrogee to DeFrancesco's right to payment from Stewart

for the unpaid contract price on the apartment building. State Farm General sought to obtain the fire insurance proceeds that Stewart had received from her insurer, defendant Hartford Insurance Company of Illinois (Hartford), and to enjoin Hartford from paying Stewart those proceeds. State Farm General later removed Hartford as a defendant in its first amended complaint, upon learning that Hartford had already paid Stewart on her claim. State Farm General subsequently filed a motion for summary judgment against Stewart, which the trial court granted. Stewart then filed a post-trial motion to vacate that order, which the trial court denied. Stewart appeals from those orders.

The undisputed facts are as follows. On January 26, 1990, DeFrancesco agreed to sell Stewart an apartment building located at 5125 West Cermak Road, Cicero, Illinois. The contract between Stewart and DeFrancesco was entitled "Real Estate Sales Contract" in an emboldened typeface and required Stewart to pay a $75,000 purchase price and additionally to assume the obligation to repay a $20,000 loan against the property to the lender, Billy Eaton. Stewart was also required to tender a $6,000 down payment to DeFrancesco, which she paid shortly after entering into the contract with DeFrancesco. The contract also contained a mortgage contingency provision and a date of closing provision, which provided in pertinent part as follows:

"4. This contract is subject to the condition that Purchaser will apply for [a] mtge within 3 months as of Feb 90 to pay off seller's balance ***. (*Strike paragraph if inapplicable.*)

5. The time of closing shall be January 26, 1990 prorated as of 2—1—90, or 20 days after notice that financing has been procured if paragraph 4 is operative *** at the office of [the] title company." (Emphasis in original.)

The sales contract further provided that Stewart "agrees to pay or satisfy the balance of the purchase price *** at the time of closing." The contract also required DeFrancesco to deliver possession to Stewart "immediately *** after the sale has been closed." The contract also stated that DeFrancesco agreed "to convey or cause to be conveyed *** a recordable warranty deed." Upon entering the contract, DeFrancesco turned over the trustee's deed (which he had received from Stewart in 1987, as discussed more fully below), the keys and the rent documents to Stewart; informed the tenants they should pay rent to Stewart; did not lease any further units; and did not enter the premises ever again.

Stewart subsequently applied to the Savings of America bank for a loan to be used to pay DeFrancesco the unpaid contract price for the apartment building. On May 11, 1990, the day of the fire, Stewart

closed on an $80,000 loan from Savings of America obtained to pay DeFrancesco the $69,000 unpaid balance owing on the building under their contract. Stewart deposited the $80,000 into her personal bank account. Stewart stated that upon learning of the fire, her attorney advised her not to pay DeFrancesco the balance due on the contract "until we figured out what the insurance companies were going to do."

Both parties carried fire insurance policies on the property. Stewart was covered by Hartford, and DeFrancesco, by the plaintiff, State Farm General. DeFrancesco's State Farm General policy provided:

"In the event of any payment under this policy, the Company shall be subrogated to all the insured's rights of recovery against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights."

After the fire, State Farm General paid DeFrancesco $84,649.78 for his fire losses, an amount that represented the policy limits plus interest. Hartford paid Stewart $130,000[1], for the fire damage sustained. Stewart then repaid the $80,000 loan, and used a portion of the $130,000 insurance proceeds to pay attorney fees incurred in defending against other lawsuits arising from the fire, the cost of boarding up and later demolishing the burned building, and the Billy Eaton loan. Although she repaid the Billy Eaton loan, Stewart did not pay the principal balance of $69,000 left owing on the contract to the seller, DeFrancesco.

In its second amended complaint, State Farm General claimed that, pursuant to its payment of insurance proceeds to DeFrancesco after the fire, it was subrogated to DeFrancesco's contractual right to collect the $69,000 unpaid purchase price for the property from Stewart and that it could collect that amount out of the insurance proceeds which she had received from Hartford. In that regard, State Farm General alleged that Stewart and DeFrancesco had entered into a real estate contract on January 26, 1990, for the sale of an apartment building located in Cicero, Illinois, for $75,000, and that Stewart paid a $6,000 down payment required under the contract. The complaint further alleged that the apartment building burned down on May 11, 1990, and that Stewart never paid DeFrancesco the unpaid portion of the purchase price, $69,000. State Farm General

---

[1]The record is unclear as to whether this $130,000 represented indemnification solely for the May 11 fire damage to the building alone or for other fire-related losses as well.

also claimed that it paid DeFrancesco $84,649.78 after the fire, that Stewart's insurance carrier indemnified her in an unspecified amount after the fire, and that as DeFrancesco's subrogee, State Farm General was entitled to $69,000 of Stewart's insurance proceeds. Attached to the second amended complaint as exhibits were a subrogation receipt[2], which purports to subrogate DeFrancesco's rights arising out of the May 11 fire to State Farm Fire and Casualty Insurance Company, another State Farm entity, and an explanatory affidavit of State Farm General claim superintendent Candace Armstrong regarding that subrogation receipt, both of which are discussed more fully below.

In her answer to the second amended complaint, Stewart alleged that State Farm General could not be subrogated to any rights that DeFrancesco may have had against her because she did not cause DeFrancesco's fire losses and, moreover, that DeFrancesco had no insurable ownership interest in the property at the time of the fire because he had transferred those interests to Stewart when he contracted to sell her the subject property. Stewart further alleged that DeFrancesco's State Farm General fire loss policy did not insure him for losses arising from Stewart's failure to pay under the Stewart-DeFrancesco contract of sale, but only for his fire-related losses. Stewart also denied that State Farm General was DeFrancesco's subrogee insofar as the aforementioned subrogation receipt, attached as an exhibit to plaintiff's second amended complaint and discussed more fully below, designated State Farm Fire and Casualty Insurance Company as subrogee to DeFrancesco's rights arising out of the fire loss. Finally, Stewart denied that she held her Hartford insurance proceeds in trust for State Farm General and stated that, in any event, she owed less than $69,000 to DeFrancesco on the building sale contract.

Attached to Stewart's answer to plaintiff's complaint was the affidavit of DeFrancesco. In that affidavit, DeFrancesco averred that Stewart originally conveyed the subject property to him in 1987 by means of a trustee's deed. DeFrancesco further stated that when he acquired the property from Stewart he assumed the duty to make payments to Billy Eaton between 1987 and 1989. He also stated that on January 26, 1990, he entered into a real estate sales contract with Stewart to transfer the property back to her and received a $6,000 down payment from her pursuant to the contract. At that time, Stew-

---

[2]This receipt was also attached to the original complaint and to State Farm General's motion for summary judgment and, as discussed below, was supplemented by the Armstrong affidavit.

art agreed to assume the Eaton loan repayments. DeFrancesco further averred that on January 26, 1990, he turned over the title, keys and rent documents to Stewart, informed the tenants they should pay rent to Stewart, did not lease any further units, and did not enter the premises ever again.

Stewart also separately filed an affirmative defense, wherein she alleged that title to the subject property was in a land trust at the time of the fire and that the records of the Cook County recorder of deeds reflected that fact. She further stated that she notified State Farm General before the May 11 fire that she "held the equitable title to the premises" in question. Stewart also alleged that DeFrancesco therefore had no insurable interest in the subject property at the time of the fire and that, nevertheless, State Farm General carelessly and without any legal obligation to do so indemnified DeFrancesco for his loss arising from the fire. Finally, Stewart alleged that she had paid her own insurance premiums to Hartford, that State Farm General had not, and that, therefore, State Farm General could not claim the benefits of her Hartford policy.

State Farm General subsequently filed its motion for summary judgment. In that motion, State Farm General argued that, by paying DeFrancesco's fire insurance claim, it became subrogated to DeFrancesco's contractual rights against Stewart. In support of its motion for summary judgment, State Farm General resubmitted the aforementioned "subrogation receipt" together with the explanatory affidavit of State Farm General claim superintendent Candace Armstrong, which were attached as exhibits to plaintiff's second amended complaint; excerpts of Stewart's deposition testimony; the DeFrancesco-Stewart contract of sale; and a certificate of insurance, which reflects that Hartford insured Stewart on the subject property for $130,000. As discussed above, the subrogation receipt stated that DeFrancesco had subrogated all of his rights with respect to his May 11, 1990, fire loss to the State Farm entity indicated at the top of that receipt. In that regard, at the top of the receipt are listed several State Farm entities with boxes next to the name of each entity. The box next to plaintiff's name, State Farm General Insurance Co., is not checked. Instead, the adjacent box is checked, indicating that a different State Farm entity, "State Farm Fire and Casualty Ins. Co.," paid DeFrancesco for his fire-related loss and was therefore the subrogee of DeFrancesco's rights arising out of the fire.

The Armstrong affidavit specifies that plaintiff State Farm General, and not some other State Farm entity, had paid DeFrancesco for his May 11, 1990, fire loss and thereby had become his subrogee. The affidavit purports to explain that plaintiff State Farm General

had inadvertently designated the wrong State Farm entity, State Farm Fire & Casualty Ins. Co., on the subrogation receipt as the entity that had paid DeFrancesco the fire insurance proceeds.

In her deposition, Stewart testified that she originally acquired the subject apartment building in 1981 in a land trust, where she held it together with certain other real estate. Stewart used the apartment building as collateral to secure a loan from the aforementioned lender, Billy Eaton. Stewart stated that, in 1984, she contracted to sell the building to DeFrancesco, and in 1987, after DeFrancesco had paid her for that building, "deeded the property personally to Mr. DeFrancesco." In so doing, she directed the trustee to prepare a trustee's deed to the property for DeFrancesco and then picked up that deed, which she then gave to DeFrancesco in exchange for an agreed-upon but unspecified cash payment and DeFrancesco's assumption of the Eaton loan repayment obligations. Stewart stated that in late 1989 and in early 1990 she and DeFrancesco discussed her repurchase of the property for $75,000 and her assumption of the Eaton loan repayment obligations. She stated that they entered into the aforementioned contract of sale on January 26, 1990, and that she paid DeFrancesco $6,000 as a down payment. She further testified that DeFrancesco returned the deed to her but that her attorney advised her not to pay DeFrancesco the unpaid balance of $69,000 on the contract after the fire "until we figured out what the insurance companies were going to do." Stewart also testified that she received approximately $130,000 in insurance proceeds from Hartford for her losses arising from the May 11 fire. Stewart further stated that between 1981 and January 26, 1990, the date on which she contracted to purchase the apartment building from DeFrancesco, Stewart was the only individual to hold a beneficial interest in the land trust in which the apartment building had been held.

In response to State Farm General's motion for summary judgment, Stewart submitted the affidavit of an "expert witness," Richard Kieffer, who stated that if State Farm General had followed the generally accepted procedures employed in the insurance industry for the adjustment of insurance claims, it would have known not to pay DeFrancesco on his claim because it would have learned prior to making that payment that only Stewart, and not DeFrancesco, had an insurable interest in the subject property.

The trial court granted State Farm General's motion for summary judgment and awarded State Farm General the amount of $69,000. Stewart filed a post-trial motion seeking vacatur of the trial court's summary judgment order, which was denied, and this appeal ensued. For the reasons that follow, we reverse.

DISCUSSION

On appeal, Stewart contends that the trial court erred in granting summary judgment in favor of State Farm General, because, she urges, State Farm General cannot be subrogated to DeFrancesco's contractual rights against her. In support, Stewart contends that because State Farm General's insurance payment to DeFrancesco was based on his fire losses and not upon his contractual losses arising from Stewart's nonpayment of the full contract price, Stewart's contractual debt to DeFrancesco was collateral to that indemnification payment. Accordingly, Stewart urges that State Farm General's subrogation to DeFrancesco's rights against Stewart would be unwarranted in the absence of an express assignment from DeFrancesco of his rights against Stewart.

In addition, Stewart contends that DeFrancesco had no insurable interest in the subject property at the time of the fire and that, therefore, State Farm General had no legal obligation to indemnify him for his purported fire losses. Thus, according to Stewart, State Farm General's payment to DeFrancesco was voluntary, thereby precluding any right to be subrogated to DeFrancesco's contractual rights against Stewart.

■ The right of subrogation may be grounded in equity and may also be founded upon an express or implied agreement. *Bost v. Paulson's Enterprises, Inc.*, 36 Ill. App. 3d 135, 343 N.E.2d 168 (1976). Subrogation is defined as the substitution of one individual in the place of a claimant to whose rights he succeeds in relation to the debt or claim asserted, which he has paid involuntarily. See generally *Dix Mutual Insurance Co. v. LaFramboise*, 149 Ill. 2d 314, 597 N.E.2d 622 (1992); *Reich v. Tharp*, 167 Ill. App. 3d 496, 521 N.E.2d 530 (1987); *Continental Casualty Co. v. Polk Brothers, Inc.*, 120 Ill. App. 3d 395, 457 N.E.2d 1271 (1983); Restatement of Restitution § 162 (1937) (subrogation proper where property of one person is used in discharging an obligation owed by another). An insurer who indemnifies its insured for a loss may be subrogated to the rights of the insured against the party at fault under the equitable doctrine that the economic burden "should be shifted to the party responsible for the loss." *In re Estate of Ito*, 50 Ill. App. 3d 817, 823, 365 N.E.2d 1309, 1314 (1977). See also *Central National Bank & Trust Co. v. Central Illinois Light Co.*, 65 Ill. App. 2d 287, 294, 212 N.E.2d 489, 493 (1965).

The prerequisites to subrogation are: (1) a third party must be primarily liable to the insured for the loss; (2) the insurer must be secondarily liable to the insured for loss under an insurance policy; and (3) the insurer must have paid the insured under that policy,

thereby extinguishing the debt of the third party. See generally *Dix Mutual Insurance Co.*, 149 Ill. 2d 314, 597 N.E.2d 622; *Reich*, 167 Ill. App. 3d 496, 521 N.E.2d 530; *Polk Brothers*, 120 Ill. App. 3d 395, 457 N.E.2d 1271; Restatement of Restitution § 162 (1937); C. King, *Subrogation Under Contracts Insuring Property*, 30 Tex. L. Rev. 62 (1951). However, when, as here, an insurer indemnifies its insured for property damage and then seeks to be subrogated to the insured's collateral contract rights against the third-party purchaser of that property not responsible for the loss, "the extent of the right to subrogation is *** difficult to determine ***. The fact that liability of the third party *** does not rest upon fault makes the relative equities of the insurer much less appealing." 30 Tex. L. Rev. at 71. See also W. Vance, Insurance § 134 (3d ed. 1951); Note, *Subrogation of the Insurer to Collateral Rights of the Insured*, 28 Colum. L. Rev. 202 (1928).

There are three possible alternatives with respect to an insurer's claim of subrogation against the contract rights of an insured: first, a court may permit the insured to keep the proceeds of both the insurance indemnification and the contract price and deny subrogation; second, a court may give the insurer the benefit of the collateral obligation; or third, a court may give the third-party obligor the benefit of the insurance. See generally 30 Tex. L. Rev. at 71; 28 Colum. L. Rev. at 203. However, each alternative possesses its own deficiencies:

> "To choose the first is to contravene the sound public policy which dictates that the insured should not be in a position to profit by a loss lest he be tempted to cause it, or be careless to prevent it; to choose the second is to give the insurer a windfall, for its premiums represented the fair equivalent of an obligation it contracted to incur without knowledge *** of the existence of collateral remedies or an abatement of rates in anticipation of such; to select the third is to violate the classical concept of the insurance contract as a personal one and, to some extent, the cherished privilege of the underwriter to select its obligor and determine its own moral risk." 28 Colum. L. Rev. at 204.

While there are no Illinois cases directly in point, the decisions among the various jurisdictions are divided as to the right of an insurer to be subrogated to an insured's collateral contract rights. See, on the one hand, *Universal Title Insurance Co. v. United States*, 942 F.2d 1311 (8th Cir. 1991), *Alabama Farm Bureau Mutual Insurance Service v. Nixon*, 268 Ala. 271, 105 So. 2d 643 (1958), and *Board of Trustees of First Congregational Church v. Cream City Mutual Insurance Co.*, 255 Minn. 347, 96 N.W.2d 690 (1959), which bolster

Stewart's position that no subrogation should be permitted here. See, on the other hand, *Twin City Fire Insurance Co. v. Walter B. Hannah, Inc.*, 444 S.W.2d 131 (Ky. 1969), which appears to articulate State Farm General's position that it may be subrogated to De-Francesco's contractual rights against Stewart notwithstanding the fact that those rights are collateral and unrelated to State Farm General's indemnification payment to DeFrancesco. See generally 4 G. Palmer, Law of Restitution § 23.2 (1978).

■ Having reviewed these authorities, we favor the view that an insurer that indemnifies its insured for property damage may not be subrogated to the collateral contractual rights of the insured against a third-party purchaser of the subject property. The case of *Board of Trustees of First Congregational Church v. Cream City Mutual Insurance Co.*, 255 Minn. 347, 96 N.W.2d 690 (1959), is in point. In *Cream City*, the plaintiffs, the trustees of a religious congregation, purchased several fire insurance policies from the defendant insurance company to cover their church property and later entered into a contract to sell that property to the City of Austin, Minnesota. Prior to the buyer's payment of the full contract price and the church's transfer of legal title, a fire destroyed the property in question. Plaintiffs submitted claims for their losses pursuant to the insurance policies issued by defendant, and defendant refused payment. Plaintiffs then sued the defendant, who argued that the church should not be permitted to recover twice for the same loss by collecting both insurance proceeds and the unpaid balance on the contract of sale. In the event that they were forced to make payment under the policies, defendants sought to be subrogated to any rights that plaintiffs had against the buyer of the property.

In holding that defendant was required to make payment to plaintiffs under the policies and that defendant had no right to be subrogated to any rights the plaintiffs may have had against the buyer, the *Cream City* court stated as follows:

> "[I]t is the universally accepted rule that an insurer may be subrogated to the insured's rights against any person wrongfully causing a compensable loss to the insured. However, there is no such agreement of authorities as to the right of the insurer to be subrogated to collateral contract rights which the insured has against a third person who did not cause the loss.
>
> In considering the asserted right of the insurer to subrogation to the collateral rights of the insured, certain conflicting considerations come into play. To permit the insured to keep the proceeds of both obligations offends public policy which frowns upon placing an insured in a position to profit by a loss which he

may be tempted to cause himself or by carelessness fail to prevent. On the other hand, to give the insurer the benefit of the collateral obligation through subrogation ignores the plain terms of the insuring agreement and provides the insurer with a windfall. Its premiums are assumed to represent the fair equivalent of the obligation it contracted to incur without knowledge of the existence of collateral remedies." *Cream City,* 255 Minn. at 347, 96 N.W.2d at 695-96.

The *Cream City* court concluded that the insurer would not be relieved of its liability under its policies, nor would it be entitled to be subrogated to the rights of the insured against the contract buyer, simply because the seller "might have collateral contracts with third persons which operate to relieve the insured from the loss for which the insurer agreed to compensate him." *Cream City,* 255 Minn. at 347, 96 N.W.2d at 696. In support, the court further noted as follows:

"The most persuasive authority to this court is our own prior holding in *Kahn v. American Ins. Co.,* 137 Minn. 16, 162 N.W. 685. In that case it was clearly held that in an action upon an insurance policy insuring the lessee against loss to his leasehold the contract relation between the lessor and lessee and a settlement of their differences arising from a fire to the leased premises are matters in which the insurer has no concern." *Cream City,* 55 Minn. at 355, 96 N.W.2d at 697.

The position articulated in *Cream City* that an insurer may not be subrogated to the collateral contract rights of its insured is consistent with the fundamental principle, already noted, that to be subrogated to the rights of another, an insurer's indemnification payment to its insured must extinguish the debt of a third party primarily liable to that insured for his loss. See *Dix Mutual Insurance Co.,* 149 Ill. 2d 314, 597 N.E.2d 622; *Reich,* 167 Ill. App. 3d 496, 521 N.E.2d 530; *Polk Brothers,* 120 Ill. App. 3d 395, 457 N.E.2d 1271; Restatement of Restitution § 162 (1937); C. King, *Subrogation Under Contracts Insuring Property,* 30 Tex. L. Rev. 62 (1951). Hence, where an insurer is not by its indemnification payment satisfying the obligation of the third party, the right of subrogation does not attach.

Moreover, the holding in *Cream City* is consistent with the decision of our Illinois Supreme Court in *First National Bank v. Boston Insurance Co.,* 17 Ill. 2d 147, 160 N.E.2d 802 (1959). Although *Boston Insurance* did not involve the subrogation rights of an insurance carrier, that decision makes clear that the obligation of an insurer to its insured remains independent of the obligation of a third-party purchaser to the insured. In *Boston Insurance,* the insured entered into a contract to sell certain property which required a downpayment of $3,000 with the balance of $16,000 to be paid at the time of

closing. Prior to closing, the property was destroyed by fire. Damage from the fire was estimated to be $230,000. The insurance policies in question together had aggregate limits of $46,750, but the carrier refused to make payment in excess of $16,000, the amount owing on the contract of sale at the time of the fire.

The *Boston Insurance* court held that the insurance carrier could not avoid or reduce its liability to the insured based upon a collateral contract of sale even though the balance due for the purchase price under the collateral sales contract was substantially less than the value of the fire damage as surveyed by the carrier. The court held that the purchase price in such a collateral contract would not limit an insurer's obligation insofar as the two obligations are wholly independent of each other. In reaching its conclusion, the court stated as follows:

> "While it is clear that a vendee can hold a vendor to the terms of his contract, it is by no means clear that a stranger to the contract should be allowed to fix upon the contract price as an absolute measure of the value of the property.
>
> \* \* \*
>
> \*\*\* [If the carrier] intended to mean that recovery should be limited by the price fixed in an executory contract for the sale of the property, it would have been easy to say so [in the policy]."
>
> *Boston Insurance,* 17 Ill. 2d at 151-54, 160 N.E.2d at 804-06.

■ As in *Cream City,* here, although State Farm General paid DeFrancesco for his fire-related losses, that payment was independent of Stewart's contractual debt to DeFrancesco insofar as Stewart did not cause those losses. As asserted both in *Cream City* and in *Boston Insurance,* State Farm General's liability to DeFrancesco is wholly separate and unrelated to the obligation of Stewart to pay the balance under the real estate purchase contract to DeFrancesco. Therefore, State Farm General's insurance payment to DeFrancesco cannot trigger any right to proceed under subrogation against the land purchaser for the purchase price. Accord *Universal Title Insurance,* 942 F.2d 1311; *Nixon,* 268 Ala. 271, 105 So. 2d 643 (holding that insurer has no right to be subrogated to insured's collateral contractual rights where to allow subrogation would be to excuse insurer from obligations created by its collection of premiums). See 30 Tex. L. Rev. at 71 (permitting the insurer to be subrogated to a contractual obligation of an insured "gives the insurer a windfall in that its premiums did not take into consideration such collateral remedies"). See also *Thornton v. Syracuse Savings Bank,* 961 F.2d 1042 (2d Cir. 1992) (no right of subrogation where payment made by purported subrogee to putative subrogor discharged its own debt, not that of third party).

■ State Farm General would argue that a denial of its right to subrogate against the vendee (Stewart) would result in a windfall to Stewart since she recovered from her own insurance carrier (Hartford) and since she did not pay the full contract price to DeFrancesco. This argument appears to be premised upon a theory of unjust enrichment. To state a cause of action upon a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment and that defendant's retention of the benefit violates fundamental principles of justice, equity and good conscience. See generally *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 545 N.E.2d 672 (1989); *F.H. Prince & Co. v. Towers Financial Corp.*, 275 Ill. App. 3d 792, 656 N.E.2d 142 (1995). A plaintiff alleging an unjust enrichment may be seeking to recover a benefit that he gave directly to the defendant or one that was transferred to the defendant by a third party. *HPI Health Care Services*, 131 Ill. 2d 145, 545 N.E.2d 672. To establish that the retention of a benefit conferred upon the defendant by a third-party constitutes an unjust enrichment, a plaintiff must show that (1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead; (2) the defendant procured the benefit from the third party through some type of wrongful conduct; or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant. *HPI Health Care Services*, 131 Ill. 2d 145, 545 N.E.2d 672.

■ In the instant case, as already discussed, State Farm General has not established that it directly conferred any benefit upon Stewart insofar as its indemnification payment to DeFrancesco was collateral to Stewart's contractual debt to DeFrancesco. Nor, for that matter, has State Farm General established that Stewart has unjustly retained a benefit conferred upon her by a third party, *i.e.*, the benefit she received from her Hartford insurance policy. State Farm General has failed to establish that it was in any way entitled to Stewart's Hartford insurance proceeds due to a mistake or that Stewart procured those proceeds through any type of wrongful conduct. Furthermore, although the record reflects that DeFrancesco apparently did not proceed in his own right to recover the balance on the purchase price from Stewart, there is nothing in the record to indicate that he did not intend to or that he would be unable to recover the purchase price from Stewart in the future. Thus, there is no indication that, in the absence of State Farm General's subrogation action, Stewart will in fact retain the purchase price as well as her own insurance proceeds.

Stewart also contends that DeFrancesco had no insurable inter-

est in the subject property at the time of the fire and that, consequently, State Farm General had no legal obligation to indemnify DeFrancesco and was therefore a volunteer. See *American National Bank & Trust Co. v. Weyerhaeuser Co.*, 692 F.2d 455 (7th Cir. 1982) (stating that mere stranger or volunteer who pays a creditor on a debt for which another is bound cannot be subrogated to the creditor's rights against the principal debtor). In response, State Farm General argues that DeFrancesco did have an insurable interest, citing to *International Insurance Co. v. Melrose Park National Bank*, 145 Ill. App. 3d 286, 495 N.E.2d 1197 (1986), which stated that a seller's interest under an installment agreement is analogous to that of a mortgagee whose insurable interest in the subject property extends to the amount of the unpaid mortgage balance. In support of its premise that a mortgagee has an insurable interest in the subject property limited to the amount of the unpaid debt, *Melrose Park National Bank* relies upon *Great-West Life Assurance Co. v. General Accident Fire & Life Assurance Corp.*, 116 Ill. App. 3d 921, 452 N.E.2d 550 (1983), which in turn relies upon our supreme court's decision in *Le Doux v. Dettmering*, 316 Ill. App. 98, 43 N.E.2d 862 (1942). The court in *Le Doux* upheld the principle that a mortgagee has a insurable interest in a property to the extent of the unpaid mortgage balance and that the insurer may be subrogated to that interest against the mortgagor.

■ Since we have predicated our decision on the theory that there can be no subrogation because of the collateral nature of the purchaser's contractual obligation, as articulated in *Cream City*, we need not determine whether in fact the vendor has an insurable interest.[3] Thus, we need not examine the decision in *Melrose Park National Bank* with respect to the insurable interest argument.

---

[3]As discussed above, Stewart also contends that State Farm General was a volunteer in that it made payment to DeFrancesco even though he had no insurable interest in the property at the time of the fire. Strong argument can be made that DeFrancesco in fact had no insurable interest at the time of the fire. As noted in our statement of facts, Stewart testified in her deposition and DeFrancesco averred in his affidavit that Stewart received the deed to and possession of the property from DeFrancesco prior to the fire. If in fact DeFrancesco had, before the fire occurred, delivered title and possession to the purchaser, he may have divested himself of an insurable interest in the property. See, *e.g., Inland Real Estate Corp. v. Tower Construction Co.*, 174 Ill. App. 3d 421, 528 N.E.2d 421 (1988). See also *Farmer v. Koen*, 187 Ill. App. 3d 47, 542 N.E.2d 1326 (1989).

Moreover, while State Farm General would contend that the doctrine of equitable conversion would give the vendor a lienholder's interest in the

However, we should nevertheless determine whether the holdings in both *Melrose Park National Bank* and in *Le Doux* militate against our implementation in Illinois of the holding in *Cream City* that an insurer may not subrogate to the claim of its insured against his vendee for the real estate purchase price.

State Farm General may well seek to contend that the approach in *Cream City* is implicitly rejected in Illinois under *Le Doux v. Dettmering*, 316 Ill. App. 98, 43 N.E.2d 862 (1942), which permits subrogation by the fire insurer of a mortgagee against the mortgagor. See also 4 G. Palmer, Law of Restitution § 23.4, at 367 (1978) (and citations therein). State Farm General may wish to contend that in permitting subrogation against the mortgagor, *Le Doux* in effect ignores the principle that an insurer cannot be subrogated to the collateral contract rights of its insured. Seemingly, this proposed contention would become even stronger if we agree with State Farm General's argument that there was an equitable conversion here[4], whereby the vendor acquires a lien interest in the land to secure the

---

subject property to protect his right to receive payment of the unpaid purchase price (see *International Insurance Co. v. Melrose Park National Bank*, 145 Ill. App. 3d 286, 495 N.E.2d 1197 (1986); *Kindred v. Boalbey*, 73 Ill. App. 3d 37, 391 N.E.2d 236 (1979)), the law is clear that that doctrine will not apply once title and possession are delivered. See *De Foor v. Northbrook Excess & Surplus Insurance Co.*, 128 Ill. App. 3d 929, 471 N.E.2d 938 (1984) (in equitable conversion, seller retains legal title to subject property after entry into contract of sale pending payment of purchase price); *Kindred*, 73 Ill. App. 3d 37, 391 N.E.2d 236. See also *Sebesta v. Daniels*, 812 S.W.2d 641, 644 (Tex. Ct. App. 1991) (doctrine of equitable conversion applies "during the period between execution of contract of sale and actual transfer of legal title"); *Parson v. Wolfe*, 676 S.W.2d 689 (Tex. Ct. App. 1984). See generally 18 C.J.S. *Conversion* § 6, at 45 (1990) (the doctrine of equitable conversion applies "during the period between the execution of the contract and the actual transfer of legal title"). See also footnote 4 and accompanying text (288 Ill. App. 3d at 693-94), for further discussion of the doctrine of equitable conversion.

[4]The doctrine of equitable conversion has been defined by our supreme court as follows:

> "Equitable conversion is the treating of land as personalty and personalty as land under certain circumstances. Hence, as between the parties and those claiming through them, when the owner of land enters into a valid and enforceable contract for its sale he continues to hold the legal title, but in trust for the buyer; and the buyer becomes the equitable owner and holds the purchase money in trust for the seller. The conversion takes place at the time of entering into the contract. It stems from the basic equitable principle that equity

purchase price. See *Kindred v. Boalbey*, 73 Ill. App. 3d 37, 39-40, 391 N.E.2d 236, 239 (1979). In that respect, State Farm General might argue that the vendor's interest would be analogous to that of a mortgagee.

However, a closer examination of the decision in *Le Doux* would reveal that it is not inconsistent with the holding in *Cream City* or with our holding in this case. In *Le Doux*, the mortgagee initially purchased insurance "as [a] legal holder of notes," to protect his security interest in the unpaid balance due under the mortgage agreement. *Le Doux*, 316 Ill. App. at 100, 43 N.E.2d at 863. Before the mortgagor fully repaid his indebtedness, the mortgaged property was destroyed by fire. The mortgagee's insurer indemnified him for the unpaid balance due under the mortgage agreement and then sought to be subrogated to the mortgagee's rights against the mortgagor. The *Le Doux* court concluded that such subrogation was permissible, stating as follows:

> "In cases like the instant one the insurance is considered as a further security of the debt; and on the familiar principle that a surety who pays the debt may resort to the principal debtor for payment, the insurer is permitted to recover from the mortgagor." *Le Doux*, 316 Ill. App. at 110, 43 N.E.2d at 868.

The *Le Doux* court reasoned that the insurance coverage obtained by the mortgagee extended only to the unpaid indebtedness under the mortgage agreement and that the insurer's indemnification payment to the mortgagee effectively satisfied the debt of the mortgagor. See also *Great-West Life Assurance Co. v. General Accident Fire & Life Assurance Corp.*, 116 Ill. App. 3d 921, 452 N.E.2d 550 (1983) (stating that a mortgagee's insurable interest is *prima facie* the amount mortgaged and extends solely to the amount of the debt). Thus, in *Le Doux*, the sole purpose of the insurance procured by the mortgagee was to secure payment of the unpaid mortgage balance, and the insurance indemnification payment to the mortgagee was in that manner directly tied and limited to that unpaid balance.

■ In contrast, here, DeFrancesco's insurance coverage with State Farm General did not purport to have as its purpose the protection of DeFrancesco's right to collect the unpaid contract price from Stewart. Rather, this insurance was procured by DeFrancesco before the property was sold to protect him from fire loss as an ongoing owner

---

regards as done that which ought to be done. The doctrine of equitable conversion has been recognized in Illinois, as it has in practically every other jurisdiction since earliest times. [Citations.]" *Shay v. Penrose*, 25 Ill. 2d 447, 449, 185 N.E.2d 218, 219-20 (1962).
See also *Ruva v. Mente*, 143 Ill. 2d 257, 572 N.E.2d 888 (1991).

of the property. DeFrancesco's insurance was not designed to simply protect his interest as a seller. In that regard, State Farm General's indemnification payment to DeFrancesco of $84,649.78 was not limited to the unpaid balance of the purchase price. State Farm General paid DeFrancesco the sum of $84,649.78 despite the fact that the actual total contract price was $75,000 and even though the unpaid balance thereon was only $69,000, Stewart having made a $6,000 down payment. Therefore, regardless of whether the circumstances would suffice to invoke the doctrine of equitable conversion, the basis and rationale in *Le Doux* for permitting subrogation (*i.e.*, that the insurance coverage and resultant indemnification payment were expressly keyed to the unpaid mortgage balance) do not exist in the instant case.

Here, as pointed out, there is no question that the insured acquired his coverage from State Farm General before the sale to Stewart. His coverage therefore was keyed to his general ownership interest rather than to any interest in the unpaid purchase price. Even if the doctrine of equitable conversion would be invocable here, it would only have arisen by operation of law and would not have changed the contractual nature of the transaction between the insurer and the insured. This stands in sharp contrast to the facts in *Le Doux*, where the mortgagee acquired the insurance only in its posture as mortgagee for the sole purpose of protecting his interest in the unpaid mortgage balance. Thus, unlike the indemnification payment made in *Le Doux*, State Farm General's indemnification payment to DeFrancesco was not geared to Stewart's indebtedness but rather was apparently paid to DeFrancesco for the independent value of his loss, in an amount well in excess of the unpaid purchase price. Consequently, as pointed out in *Boston Insurance*, the insurer's obligation was wholly separate and independent of any obligation of the purchaser for the unpaid balance of the purchase price. Therefore, as in *Cream City*, subrogation would not be warranted since the indemnification of the insured did not purport to satisfy the wholly collateral obligation of the purchaser.

Moreover, as pointed out in *Boston Insurance* and as reiterated in *Melrose Park National Bank*, the doctrine of equitable conversion is only enforceable as between the parties and does not alter the rights and obligations of third parties. The court in *Boston Insurance* summarized this principle as follows:

> "[The doctrine of equitable conversion] was evolved in order to carry out the intention of the parties to the contract. *** [I]t has frequently been held and stated that it should have no effect upon the rights of others. *** 'The doctrine *** extend[s] only to those

persons who claim or are entitled to the property under or through the instrument ***.' " *Boston Insurance*, 17 Ill. 2d at 150-51, 160 N.E.2d at 804, quoting 4 J. Pomeroy, Equity Jurisprudence § 1166, at 492 (5th ed. 1941).

Thus, the insurance carrier as a third-party to the vendor-vendee relationship is not free to invoke the doctrine of equitable conversion as between the vendor and the vendee for its own benefit or purpose. See also *Melrose Park National Bank*, 145 Ill. App. 3d at 289, 495 N.E.2d at 1199 (summarizing the decision of *Boston Insurance* as holding that the doctrine of equitable conversion "acts upon only the parties to a contract and has no effect on the rights of others").

The result here also finds support in the Pennsylvania decision of *Dubin Paper Co. v. Insurance Co. of North America*, 361 Pa. 68, 63 A.2d 85 (1949). Like the *Boston Insurance* decision, that case involved an attempt by an insurer to benefit from an insured's collateral contract rights against a third-party to reduce its obligation to indemnify its insured. In rejecting the insurer's arguments, the *Dubin Paper* court stated as follows:

> "The following statement from plaintiff's brief is correct: 'The theory that the vendor's policies represented nothing more than his security for the unpaid balance of the purchase price is completely untenable. *** On the contrary, *** [the insured], who insured his property long before he contemplated selling it, had every intention of insuring his entire interest therein at a time when he had both legal and equitable title. [He] paid premiums for insurance on his whole estate, not merely on the balance of the purchase price.' ***
>
> * * *
>
> [The insured] was simply the beneficiary in two different contracts whose subject matter was his property. *** One contract defined [the insured's] rights against the insurance companies; the other contract defined [the insured's] right against the purchaser of his property. ***
>
> * * *
>
> *** 'The vendor had an insurable interest in the whole estate both legal and equitable, and not just to the extent of the unpaid purchase price. *** The policies when issued covered the whole interest, the premiums covered vendor's [*sic*] entire insurable interest and the contracts of insurance covered the vendor's insurable interest even in the event of an agreement of sale. Further, the [insurer] *** recognized [the insured] had an insurable interest in the full value of the property by actually sending drafts in payment of this claim [to him]. ... The [insurer] accepted the entire premium for the whole interest both legal and equitable ***. Why

should they be permitted to take advantage of a collateral contract existing and enforceable only as between vendor and vendee so as to escape liability for a loss contracted for and the risk for which they were paid for many years?' " *Dubin Paper Co.*, 361 Pa. at 86-92, 63 A.2d at 94-97.

The decision in *Dubin Paper Co.*, as those of *Cream City* and *Boston Insurance*, makes clear that State Farm General's indemnification payment to DeFrancesco was unrelated to Stewart's contractual debt and would therefore not provide a basis for subrogation. If subrogation were allowed, State Farm General would be repaid for its indemnification of DeFrancesco from his collateral contract rights despite having collected premiums that secured its coverage obligation and that were calculated without any knowledge or expectation of collateral recoveries.[5]

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed, and the cause is remanded for further proceedings in accordance herewith.

Reversed and remanded.

HOURIHANE, J., concurs.

PRESIDING JUSTICE COUSINS, dissenting:

I dissent.

In the case *sub judice*, the verified complaint for injunction and imposition of trust filed by State Farm Insurance Co., as subrogee of Vito DeFrancesco, against Nancy Stewart alleges *inter alia*:

"At the time of the execution of the real estate contract, Stewart paid $6,000.00 as a down payment and DeFrancesco transferred possession of the property in accordance with the terms of the contract.

On or about May 11, 1990, the apartment building located at 5125 West Cermak Road, Cicero, Illinois, was destroyed in a fire.

At the time of the fire, and to the present time, the balance owed by Stewart pursuant to the terms of the real estate contract

---

[5]In order to comply with appellate court page limitations specified by revised Supreme Court Rule 23 (166 Ill. 2d R. 23), the discussion of certain issues has been designated as nonpublishable. These include issues pertaining to State Farm General's purported right to subrogation under the Uniform Vendor and Purchaser Risk Act (765 ILCS 65/1 *et seq.* (West 1994)) and under the subrogation provisions of its policy. A full, unabridged text of this decision is on file with the clerk of this court under Docket No. 94—3161.

was $69,000. Stewart further agreed to assume an alleged loan to a third-party named Billy Eaton.

Pursuant to the Conditions and Stipulations in paragraph 4 of the contract, risk of loss by fire is determined according to the provisions of the Uniform Vendor and Purchaser Risk Act [(Ill. Rev. Stat. 1989, ch. 29, par. 8.1). Section 1(b)] of the Act provides as follows:

> (b) If, when either the legal title or the possession of the subject matter of the contract has been transferred, all or any part thereof is destroyed without fault of the vender or is taken by eminent domain, the purchaser is not thereby relieved from a duty to pay the price, nor is he entitled to recover any portion thereof that he has paid ***."

The deposition of Stewart included the following testimony regarding the contract:

"Q. What was the sale price of the building?

\* \* \*

A. Seventy-five thousand.

Q. And what specifically did you discuss in any of these conversations in December of 1989 or January of 1990 regarding the nature of the sale that would be completed?

A. Well, we discussed that the building in its current condition, that I wouldn't be able to get a loan, so we wouldn't make the sale contingent on a mortgage, that he would sell me the building, I would repair it, and then I would get a loan on it and I would pay him the money.

Q. Were there any time parameters set for you doing that?

A. That I would apply for the loan in three months. That was the only frame.

Q. Did you and Mr. DeFrancesco ever discuss when the balance of the purchase price would be paid?

A. Yes.

Q. What was said about that?

A. It was to be paid when I got the loan that I applied for within the three months."

On the same date the property was destroyed by fire, Stewart obtained financing in the sum of $80,000. Stewart subsequently received $130,000 for the fire loss from Hartford Insurance Company of Illinois.

DeFrancesco also insured the property in question. He was the named insured with State Farm General Insurance Co. with liability limits of $79,000 covering the premises. The policy covered the period beginning July 10, 1989, and ending July 10, 1990. The policy contained the following subrogation clause:

"7. Subrogation.

 a. In the event of any payment under this policy, the Company shall be subrogated to all the insured's rights of recovery against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights."

State Farm Insurance contended below and also on appeal that Stewart breached the terms of the January 1990 contract. Also, pursuant to the equitable conversion doctrine, Stewart held her insurance proceeds in trust for the benefit of State Farm. We should affirm the trial court's grant of summary judgment in the instant case because the record supports State Farm's contention and the trial court's decision.

Stewart posits that the trial court erred in granting summary judgment because triable issues remained to be decided. It is the province of the appellate court to review the record to determine whether a trial court has erred in granting summary judgment. See *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113, 649 N.E.2d 1323 (1995). However, we should affirm the trial court in the instant case because an examination of the record reveals that the trial court considered the pleadings, affidavits, depositions, and arguments by the parties and did not err in granting summary judgment.

Stewart also contends that DeFrancesco had no insurable interest in the property. However, the indisputable facts in the instant case establish that Stewart is clearly wrong on this issue. The law is clear that one need not even own property to have an insurable interest in the property. See *Hawkeye-Security Insurance Co. v. Reeq*, 128 Ill. App. 3d 352, 355, 470 N.E.2d 1103 (1984); *International Insurance Co. v. Melrose Park National Bank*, 145 Ill. App. 3d 286, 290, 495 N.E.2d 1197 (1986); *IMM Acceptance Corp. v. First National Bank & Trust Co.*, 148 Ill. App. 3d 949, 954, 499 N.E.2d 1012 (1986).

Stewart further contends that the doctrine of equitable conversion is inapplicable to the facts of this case. Stewart's view is not well founded.

The doctrine of equitable conversion is set forth in *Shay v. Penrose*, 25 Ill. 2d 447, 449, 185 N.E.2d 218, 219-20 (1962). *Shay* holds:

"Equitable conversion is the treating of land as personalty and personalty as land under certain circumstances. Hence, as between the parties and those claiming through them, when the owner of land enters into a valid and enforceable contract for its sale he continues to hold the legal title, but in trust for the buyer; and the buyer becomes the equitable owner and holds the

purchase money in trust for the seller. The conversion takes place at the time of entering into the contract. It stems from the basic equitable principle that equity regards as done that which ought to be done. The doctrine of equitable conversion has been recognized in Illinois, as it has been in practically every other jurisdiction." *Shay*, 25 Ill. 2d at 449.

Finally, the majority in the case *sub judice* concludes that the prerequisites for subrogation were not met in the instant case. I disagree. The majority correctly states:

"The prerequisites of subrogation are: (1) a third party must be primarily liable to the insured for the loss; (2) the insurer must be secondarily liable to the insured for loss under an insurance policy; and (3) the insurer must have paid the insured under that policy, thereby extinguishing the debt of the third party. [Citations]." See 288 Ill. App. 3d at 686-87.

However, although the majority correctly states the law relating to subrogation, a proper analysis of the record in the instant case evinces that the majority decision misapplies the rule of law in the instant case.

As stated by the majority, there are no Illinois cases directly on point and the decisions among various jurisdictions are divided as to the right of an insurer to be subrogated to an insured's collateral contract rights. Relative thereto, the majority also writes:

"Having reviewed these authorities, we favor the view that an insurer that indemnifies its insured for property damage may not be subrogated to the collateral contractual rights of the insured against a third-party purchaser of the subject property. [Citation]." 288 Ill. App. 3d at 688.

However, the record in the instant case establishes that Stewart received $130,000 for a building that she never paid for; that Stewart owed Vito DeFrancesco a balance of $69,000 on the building when the same was destroyed by fire; and that State Farm Insurance Company paid DeFrancesco $84,649.78 after the fire. Accordingly, State Farm Insurance Company was the subrogee of Vito DeFrancesco.

The case of *Twin City Fire Insurance Co. v. Walter B. Hannah, Inc.*, 444 S.W.2d 131 (Ky. 1969), is analogous to the instant case and is instructive. In *Twin City*, the insurer issued a fire policy to third parties who thereafter deeded the insured property to a corporate party, which, in turn, entered into a contract with vendees under which vendees promised to pay $4,500 for the property. The property was partially destroyed by fire, at which time the vendees still owed the corporate party $3,450 on the purchase price. The court in *Twin City* held that the insurer was entitled to be subrogated to the rights of the corporate party against the vendees and wrote:

"Had Twin City [the insurer] at once paid Hannah [the corporate party] $3450.00, representing the balance owed by Dunaway [the vendee], it would have succeeded to Hannah's rights against Dunaway." *Twin City Fire Insurance Co. v. Walter B. Hannah, Inc.,* 444 S.W.2d at 136.

Similarly, in the instant case, as the trial court ruled, State Farm Insurance Co. at once paid DeFrancesco the $69,000 balance owed by Stewart and became entitled to succeed to DeFrancesco's rights.

Perforce, I dissent.