THE GREAT-WEST LIFE ASSURANCE COMPANY, Plaintiff-Appellant and Cross-Appellee, *v.* GENERAL ACCIDENT FIRE AND LIFE ASSUR-ANCE CORPORATION, LIMITED, Defendant-Appellee and Cross-Appellant.

First District (4th Division)   No. 81—2777

Opinion filed June 9, 1983.—Rehearing denied August 19, 1983.

Peterson, Ross, Schloerb & Seidel, of Chicago (J. Robert Geiman and Robert A. Seidel, of counsel), for appellant.

Cotton, Watt, Jones, King & Bowlus, of Chicago, and Rein, Mound & Cotton, of New York, New York (John M. Bowlus and Ernest E. Rosenberg, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Plaintiff, the Great-West Life Assurance Company (Great-West), appeals from the order of the trial court denying its motion for summary judgment and granting the cross-motion for summary judgment filed by defendant, General Accident Fire and Life Assurance Company, Ltd. (General Accident). In addition, both parties appeal the entry of judgment in favor of Great-West in the amount of $15,418.66.

The sole issue presented for review is whether the trial court was correct in its determination of the limit of liability imposed by an endorsement to a contract of insurance between the parties. The trial court's decisions on the motions for summary judgment and the amount of the judgment as entered were each a direct result of that initial determination of the limit of liability.

We affirm the decision of the trial court.

FACTS

On July 15, 1978, General Accident issued to Great-West an all-risks policy providing insurance coverage for Great-West's property at several locations and assessing an annual premium of $104,250. The policy contained the following pertinent terms and provisions:

> "IN CONSIDERATION OF THE PROVISIONS AND STIPULATIONS HEREIN OR ADDED HERETO AND OF the premium above specified, this Company *** at location of property

involved, to an amount not exceeding the amount(s) above specified [$2,500,000], does insure the insured named above *** to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss *** nor in any event for more than the interest of the insured, against all DIRECT LOSS BY FIRE ***.

* * *

3. *LIMIT OF LIABILITY*
Except as otherwise specified herein or by endorsement hereto, this Company shall not be liable for more than the following limits for any one loss ***: $2,500,000 as respects the perils of Fire ***.

4. *DEDUCTIBLE*
a. All losses, damages or expenses arising out of any one disaster or casualty shall be adjusted as one loss, and from the amount of such adjusted loss shall be deducted the sum of $25,000.

* * *

7. *PROPERTY COVERED*
a. *Real Property*
Except as hereinafter excluded, this policy covers:
(1) The interest of the Assured in all real property owned, used, or intended for use by the Assured *** or hereafter erected, or acquired ***.
(2) The interest of the Assured in the real property of others in the Assured's care, custody or control, and the Assured's liability imposed by law or assumed by contract, whether written or oral, for such property.

III

II. *VALUATION*
(a) *Real Property*: In case of loss the basis of adjustment unless otherwise endorsed herein shall be on a replacement cost basis if repaired or replaced at the same or another site, otherwise actual cash value."

In addition to its property interests specifically covered by the all-risks policy, Great-West also was mortgagee of a building located at 213-31 Institute Place in Chicago, Illinois. The trust deed securing the promissory note held by Great-West provided that the company was entitled to make expenditures or take other action necessary to protect the premises:

"All moneys paid for any purposes herein authorized and all expenses paid or incurred in connection therewith \*\*\*, and any other moneys advanced by Trustee or the holders of the note to protect the mortgaged premises and the lien hereof \*\*\* shall be so much additional indebtedness secured hereby and shall become immediately due and payable without notice and with interest thereon \*\*\*."

On January 5, 1977, Great-West filed a complaint in the chancery division of the circuit court of Cook County to foreclose on the trust deed, the remaining principal indebtedness on the note at that time being $198,447.59. However, the decree of foreclosure was not entered until February 22, 1979, at which time the decree established the total unpaid principal, accrued interest, fees, miscellaneous expenses, and attorney fees to be $261,870.55.

On February 5, 1979, an endorsement was added to the all-risks policy:

"It is hereby understood and agreed that in consideration of an additional premium of $171, the following location is added with Great-West Life Assurance Company as mortgagee AIMA [as interest may appear]:

213-231 Institute Place

Chicago, Illinois

$400,000—On Building

Valuation on this location is to be on an actual cash value basis.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED."

The decree of foreclosure, entered on February 22, 1979, found that the mortgagor had waived his equity of redemption, and the mortgagee, Great-West, had acquired rights in the property superior to all others except judgment creditors. Then, on March 22, 1979, one month after the entry of the foreclosure decree but before the foreclosure sale, fire caused extensive damage to the building. By the time the sheriff's deed was issued on April 28, 1979, following the foreclosure sale, Great-West had spent $12,373.55 to protect and maintain the premises. Also, Great-West spent $325,716.65 to reconstruct the building after the fire.

At the public sale of the fire-damaged property, which took place on April 19, 1979, Great-West successfully bid in the property for $247,742.51. On April 25, four days after the purchase, another endorsement to the all-risks policy was executed, amending the statement of Great-West's interest in the Institute Place property from

that of mortgagee to sole owner. The sheriff's report of sale and distribution, filed on April 26, 1979, found that after subtracting the amount bid by Great-West from the total amount of the foreclosure decree, including interest and other miscellaneous expenses properly included, Great-West was still owed $28,045.11, a deficiency covered by the insurance policy. Accordingly, General Accident tendered to Great-West a check for $3,045.11, representing the net amount of the deficiency minus the $25,000 deductible.

Great-West, maintaining that General Accident had arbitrarily rewritten the terms of the policy, filed a complaint for a declaratory judgment to establish the amount of insurance proceeds due from General Accident under the all-risks policy. General Accident's answer asserted the affirmative defense that because the outstanding mortgage debt is the limit of a mortgagee's insurable interest, Great-West's interest as mortgagee of the subject property had been reduced to the same extent that the mortgage debt had been reduced by the foreclosure sale; the insurer, therefore, was liable only for the difference between the debt still owed on the note and the amount Great-West had bid in for the property. Great-West, on the other hand, argued that the endorsement set a limit of $400,000 coverage on the Institute Place property, so the $325,716.65 spent to repair the fire damage should be recoverable under the terms of the all-risks policy.

Great-West filed motions to strike defendant's affirmative defenses and for judgment on the pleadings; both motions were denied. Thereafter, General Accident moved for summary judgment dismissing the complaint; Great-West cross-moved. Although General Accident's motion was granted and Great-West's denied, the trial court entered judgment in favor of Great-West for $15,418.66, representing the $3,045.11 balance remaining on the mortgage debt plus Great-West's costs of $12,373.55 for maintaining and protecting the property after the fire.

Both parties have appealed from the judgment order. Plaintiff Great-West claims that the contractually agreed-upon $400,000, not the mortgage debt, is the limit of recovery under the insurance policy, and therefore defendant General Accident owes to the plaintiff the full $325,716.65 cost of repairing the fire damage, minus the deductible. On the other hand, General Accident cross-appeals from that part of the judgment order holding defendant liable for more than the deficiency balance, $3,045.11, on the ground that the additional $12,373.55 was not included in the final order filed with the court approving the sheriff's report of sale and distribution after the foreclo-

sure sale.

OPINION

# I

The only issue raised in an appeal of a trial court's granting a motion for summary judgment is whether "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Ill. Rev. Stat. 1979, ch. 110, par. 57(3); *Econo Lease, Inc. v. Noffsinger* (1976), 63 Ill. 2d 390, 393, 349 N.E.2d 1, 2.) If documents to be considered show that there is a genuine issue as to any material fact, summary judgment should not be granted. (*Gelsumino v. E. W. Bliss Co.* (1973), 10 Ill. App. 3d 604, 295 N.E.2d 110.) In ruling on a motion for summary judgment, the trial judge must construe the pleadings and documents in the light most favorable to the nonmoving party. (*Dakovitz v. Arrow Road Construction Co.* (1975), 26 Ill. App. 3d 56, 324 N.E.2d 444.) Our task, therefore, is to examine the pleadings and the contract of insurance to determine whether one of the interpretations outlined above is correct as a matter of law. If so, then summary judgment in favor of the party maintaining that position is appropriate. On the other hand, if fair-minded persons considering the contract in light of the relevant principles of law could draw different conclusions, then the issues should be submitted to a jury to determine what conclusion seems most reasonable. *Silberstein v. Peoria Town & Country Bowl, Inc.* (1970), 120 Ill. App. 2d 290, 257 N.E.2d 12.

We necessarily begin with a review of the relevant principles of the law governing property insurance. First, "[a] contract of insurance is one of indemnity merely and any person having an interest in property may, through an insurance contract, indemnify himself against loss by fire or other insurable casualty. Mortgagors and mortgagees each have an insurable interest in the mortgaged property and the interests of both may be covered in one policy, or each may take out a separate policy." (*Le Doux v. Dettmering* (1942), 316 Ill. App. 98, 109, 43 N.E.2d 862, 867.) The amount recoverable by a mortgagee after a loss does not depend upon whether the mortgagee's interest is protected through independently purchased insurance or through a loss-payable clause in the mortgagor's policy.

"Generally speaking, a person has an insurable interest in property whenever he would profit by or gain some advantage by its con-

tinued existence and suffer loss or disadvantage by its destruction." (*Lieberman v. Hartford Fire Insurance Co.* (1972), 6 Ill. App. 3d 948, 949, 287 N.E.2d 38, 40, citing 3 Couch on Insurance sec. 24:13, at 86 (2d ed. 1960).) Because "[t]he law does not seek to evaluate the extent of the insurable interest *** [i]t therefore is immaterial that the interest of the insured is overvalued as long as the actual interest is substantial" enough in relation to the amount of insurance to avoid invalidation of the contract on the ground that it is an illegal wager. However, recovery is limited to the extent of the actual interest. 3 Couch on Insurance sec. 24:2, at 67-68 (2d ed. 1960).

■ "The mortgagee's insurable interest is prima facie the value mortgaged, and extends only to the amount of the debt, not exceeding the value of the mortgaged property." (3 Couch on Insurance sec. 24:72, at 160 (2d ed. 1960).) As between a mortgagor and mortgagee, " '*** the insurance money, in case of the destruction of the property, represents the property itself ***.' " (*White v. United States Fidelity & Guaranty Co.* (1974), 21 Ill. App. 3d 588, 594, 316 N.E.2d 131, 136, citing *Grange Mill Co. v. Western Assurance Co.* (1886), 118 Ill. 396, 399, 9 N.E. 274, 275.) The purpose of insurance protecting the mortgagee's interest is to secure payment of the balance of the debt evidenced by the mortgage note in the event that the building should be damaged or destroyed. (21 Ill. App. 3d 588, 595, 316 N.E.2d 131, 137.) Consequently, the balance of the debt at the time of the fire determines the amount recoverable by the mortgagee. 4 Appleman, Insurance Law & Practice sec. 2122, at 34 (1969).

Unlike the mortgagor, whose "insurable interest covers the full value of the mortgaged premises even though the mortgage debt is equivalent to the full value of the property" (3 Couch on Insurance sec. 24:69, at 154 (2d ed. 1960), citing *Trustees of Schools v. St. Paul Fire & Marine Insurance Co.* (1920), 296 Ill. 99, 129 N.E. 567), the mortgagee relies on the property only as security for his debt (296 Ill. 99, 129 N.E. 567), because "in insuring, he is insuring not the real estate but his interest or lien thereon." (3 Couch on Insurance sec. 24:72, at 160 (2d ed. 1960).) "The risk insured against is an impairment of the mortgaged property which adversely affects the mortgagee's ability to resort to the property as a source for repayment. Where the debt has been satisfied in full subsequent to the fire, neither reason nor precedent suggest recovery on the policy by the mortgagee." *Whitestone Savings & Loan Association v. Allstate Insurance Co.* (1971), 28 N.Y.2d 332, 337, 270 N.E.2d 694, 697.

A mortgagee retains an insurable interest sufficient to sustain his policy even though the property has been sold under deed of trust, so

long as a judgment creditor holds the right to redeem the premises. If the insurance policy provides that any loss is payable to the mortgagee as his interest may appear and his right to recover will not be invalidated by foreclosure or sale, the mortgagee's own purchase of the property at the foreclosure sale will not preclude his recovery for any loss after the sale but within the statutory period of redemption. (3 Couch on Insurance sec. 24:72, at 161 (2d ed. 1960).) "*** it is well settled that full or partial extinguishment of the debt itself, whether prior to the loss [citation] or subsequent to the loss [citation], precludes to the extent thereof, any recovery by the *** mortgagee for the plain and sole reason that the debt itself, has been to that extent extinguished." *Insurance Co. of North America v. Citizens Insurance Co.* (7th Cir. 1970), 425 F.2d 1180, 1182, quoting *Rosenbaum v. Funcannon* (9th Cir. 1962), 308 F.2d 680, 684.

■ Turning now to an examination of the instant case, we can see clearly that the trial judge's disposition of both motions for summary judgment was correct. A comparison of the facts of the case at hand to the principles governing a mortgagee's right to recover under a policy of real property insurance shows that, as to the Institute Place property, at the time of the loss Great-West was insured as "Mortgagee, AIMA [as interest may appear]." The principle of indemnification underlying all insurance allows recovery only of the loss suffered by the insured, no matter what the maximum limit of liability specified in the contract of insurance. The policy itself stated that the limit of insurance on any given piece of property extended to the actual cash value of the property at the time of loss "nor in any event for more than the interest of the insured." The endorsement to the policy clearly indicates Great-West's interest in the Institute Place property to be that of mortgagee, possessor of a lien against the property; the amount of the lien, therefore, is the extent of Great-West's insurable interest. Omitting consideration of the deductible amount and including all appropriate fees and interest from the date of the foreclosure decree to the date of sale, Great-West's lien and therefore insurable interest, as ultimately determined by the trial court, was valued at a maximum of $288,616.17. At no time during its tenure solely as mortgagee before the foreclosure sale could Great-West have recovered more than that amount for a fire loss. By bidding in the debt to purchase the property, Great-West established that amount as its estimate of the value of the property in its burned condition at the time of the sale; General Accident, in accordance with the insurance policy, paid to Great-West the deficiency between the amount bid and the amount of the remaining mortgage debt, thus

making Great-West whole.

Great-West dismisses as inapplicable all the case law cited by General Accident that discussed a mortgagee's limit of recovery under a loss-payable insurance policy rather than under an independently purchased policy insuring the mortgagee's interest. Not only does Great-West fail to explain clearly why that case law is inapplicable, but our reading of the insurance contract between the parties discloses that in the instant case, either a loss-payable clause or an independent contract of insurance would have limited Great-West's recovery to the amount of its debt, be that debt satisfied by insurance proceeds or by foreclosure and acquisition of legal title to the property in exchange for its mortgage note. The policy at issue contains a subrogation clause declaring that "[i]n the event of any payment under this policy, [General Accident] shall be subrogated to the extent of such payment to all [Great-West's] rights of recovery therefor." A standard mortgage (loss-payable) clause provides that in the event the insurer makes any payment to the mortgagee under the policy *and* finds that "as to the mortgagor or owner, no liability existed, *** [the insurer] shall, to the extent of such payment, be thereupon legally subrogated to all the rights" of the payee "to the extent of the payment." In the instant case, no payment was made to any mortgagor or owner; had Great-West collected the amount of its debt from its insurer, it would have had to relinquish its mortgage note and its right to foreclosure. (*Le Doux v. Dettmering* (1942), 316 Ill. App. 98, 43 N.E.2d 862.) Instead, it retained the mortgage note, foreclosed on the property, and in that manner satisfied its debt. Contrary to its assertion that it "recovered nothing," Great-West has recovered its debt by exchanging the mortgage note for title to the property.

Had Great-West effected repairs to the building in order to *restore* the building to the value of the mortgage debt, the trust agreement granted explicit permission to add the cost of such repairs to the amount of the mortgage debt. Great-West's bidding in the note at the sale is evidence that the fire damage had not reduced the value of the property below that evidenced by the mortgage note. In any event, Great-West never raised this issue, and a court of review is not required to search the record to find a reason for reversing the judgment of the trial court. *Thanopoulos v. Pickens* (1980), 87 Ill. App. 3d 906, 409 N.E.2d 477.

Instead of the form of the mortgage insurance (*i.e.*, a loss-payable clause or an independent policy) being determinative, the pivotal fact on which the limit of recovery depends is the sequence of the two

events, foreclosure sale and loss. The only cases upholding a mortgagee's right to recover the full amount of the loss deal with situations in which the foreclosure sale was complete; the mere institution of foreclosure proceedings, including the issuance of the foreclosure decree, does not effect a change in the mortgagee's interest. 5A Appleman, Insurance Law & Practice sec. 3403, at 299-304 (1970).

If the mortgagee purchases the property at a foreclosure sale before the fire loss, "the amount bid at the foreclosure was for the property in an undamaged condition and the mortgagee required the insurance proceeds to restore the property to the condition it was in at the time of the foreclosure. *** [A] mortgagee who has foreclosed has a type of ownership of which he may be divested until the period of redemption has expired. *** Why should the mortgagee, so long as its ownership may be only temporary, be required to procure an owner's policy in order to protect itself adequately?" (*City of Chicago v. Maynur* (1975), 28 Ill. App. 3d 751, 755, 329 N.E.2d 312, 315.) In *Trustees of Schools v. St. Paul Fire & Marine Insurance Co.* (1920), 296 Ill. 99, 129 N.E. 567, the Illinois Supreme Court upheld the right of a mortgagee to recover the full loss suffered from a fire occurring after a foreclosure sale at which the mortgagee purchased the property. The court reasoned that because a foreclosure was not complete until the redemption period had passed, the mortgagee continued to have an insurable interest as mortgagee. *Maynur* further explained that "the mortgagee's acquisition of the property through foreclosure results in an increase in the mortgagee's interest rather than a change of ownership." 28 Ill. App. 3d 751, 754, 329 N.E.2d 312, 315.

On the other hand, when the loss precedes the foreclosure sale,

> "the mortgagee has an election as to how he may satisfy the mortgage indebtedness by two different means. he may look to the insurance company for payment as mortgagee *** and may recover, up to the limits of the policy, the full amount of the mortgage debt at the time of the loss. In this event he would have no additional recourse against the mortgagor for the reason that his debt has been fully satisfied.

> The second alternative available to the mortgagee is satisfaction of the mortgage debt by foreclosure. If the mortgagee elects to pursue this latter option, and the foreclosure sale does not bring the full amount of the mortgage debt at the time of the loss, he may recover the balance due under the insurance policy as owner.

> * * *

[A]t the time of, and immediately after the fire loss, plaintiff-

mortgagee is the creditor of the owner, the plaintiff-mortgagee having had security for that debt in the form of a mortgage on the property and a claim for the loss on the insurance policy. *But in no event is the plaintiff-mortgagee due to collect more than the debt secured.* \*\*\* When a mortgagee forecloses and at the sale he collects the *full* amount of his debt, he is no longer a creditor as his debt is paid. [This] rationale \*\*\* appears to be in the mainstream of judicial thought throughout the country." *Nationwide Mutual Fire Insurance Co. v. Wilborn* (1973), 291 Ala. 193, 198, 279 So. 2d 460, 463-64, citing 5A Appleman, Insurance Law & Practice sec. 3403, at 301-03 (1970); accord, *White v. United States Fidelity & Guaranty Co.* (1974), 21 Ill. App. 3d 588, 316 N.E.2d 131.

Contrary to Great-West's assertion, General Accident is not "rewriting the policy" by collecting premiums to assure one level of coverage and later, after a loss, interpreting the policy so as to limit its liability to a far lesser amount. By adding a further endorsement to the policy after the foreclosure sale, memorializing its change of status from mortgagee to owner, Great-West confirmed General Accident's contention that Great-West's status at all times prior to the sale, including the date of the fire, was that of mortgagee and its recovery limited to the extent of the mortgage debt.

Neither has General Accident "reinterpreted" the language of the policy. Rather, it is Great-West who is trying to reinterpret the word "mortgagee" by claiming that a "foreclosing mortgagee" prior to the foreclosure sale has obtained a status different from that of "mortgagee." We disagree. Even *Home Insurance Co. v. Mendenhall* (1897), 164 Ill. 458, 45 N.E. 1078, the case cited by Great-West in support of its argument that an "expectation of ownership" constitutes an interest insurable to the limit of the loss, is inapposite. The expectation of ownership present in *Mendenhall* was the expectation of the issuance of a deed *following* a master's sale; the 20-day statutorily decreed delay was identical in effect to the statutory period of redemption present in *Maynur*. As in *Mendenhall* and *Maynur*, had the fire at Institute Place occurred after the sale, the $400,000 limit of coverage in the endorsement would have been the maximum recovery available to Great-West instead of the amount of the mortgage debt.

■ What, then, is the proper characterization of the $325,716.65 spent by Great-West to repair the damage to the property? In effect, that expenditure constituted an advance of additional money by Great-West, the mortgagee, to the title holder. "[T]he words 'as its interest shall appear' have reference to the amount which may be due

the mortgagee on the mortgage debt which is originally brought to the attention of the insurer. It was not intended to include additional claims, but was intended to provide for a diminution of the interest of the mortgagee by the reduction, by payment or otherwise, of the amount of the debt." (*Attleborough Savings Bank v. Security Insurance Co.* (1897), 168 Mass. 147, 149, 46 N.E. 390, 391.) Great-West had not yet purchased the property at the sale, so it cannot benefit from *Maynur's* conclusion that the purchase increases the mortgagee's interest.

The only way that the additional amount could have been included in Great-West's interest in the property (AIMA) at the time of the fire is if the trust deed allowed the mortgagee to spend any amount of money on the property and then simply add it to the promissory note, thereby unilaterally increasing by any amount the mortgage debt due. Great-West does not attempt to construe the trust deed in such a manner, for it is obvious that the conclusion would be unsupportable.

In light of the foregoing analysis, it is clear to us that no question of fact exists concerning the proper limit of recovery available to Great-West, and the trial court did not err in entering summary judgment in favor of General Accident.

## II

█ The second question raised in this appeal concerns the propriety of the trial court's awarding Great-West $12,373.55 in addition to the calculated deficiency of $3,045.11. General Accident argues that because the sheriff's report of sale and distribution did not include the expenditures Great-West made to secure and protect the damaged building after the fire, those sums, totalling $12,373.55, may not be included in the deficiency amount recoverable under the policy. On the other hand, Great-West maintains that those amounts were automatically added to the amount of the mortgage debt under the provisions of the trust deed quoted earlier. We agree with Great-West.

The $12,373.55 expenditure made after the fire was authorized by the language of the trust deed specifically providing that such "moneys advanced by the *** holders of the note shall be so much additional indebtedness secured *** [by the mortgage note] and shall become immediately due and payable without notice and with interest thereon." Consequently, those expenditures were not the type of additional fees and expenses attributable to the foreclosure sale and therefore to be included in the sheriff's report, but should have been added to the amount of remaining indebtedness on the note itself, and that total entered on the sheriff's report as the remaining amount due on

the note.

We find that the trial court's recalculation of the deficiency due Great-West under the insurance policy was correct and therefore affirm the entry of judgment in favor of Great-West in the amount of $15,418.66.

Affirmed.

ROMITI, P.J., and JIGANTI, J., concur.