May 21, 1997
Third Division

No. 1-94-3161

STATE FARM GENERAL INSURANCE CO., )
As Subrogee of VITO DEFRANCESCO, )
 )
 Plaintiff-Appellee, )
 ) Appeal from the Circuit
v. ) Court of Cook County.
 )
NANCY STEWART, )
 )
 Defendant-Appellant, ) Honorable
 ) Aaron Jaffee,
and ) Judge Presiding.
 )
HARTFORD INSURANCE COMPANY )
OF ILLINOIS, )
 )
 Defendant. )

 JUSTICE GORDON delivered the opinion of the court: 
 Vito DeFrancesco contracted to sell an apartment building
located in Cicero, Illinois to defendant Nancy Stewart. After
DeFrancesco delivered the deed to and possession of the premises
to Stewart, but before Stewart paid him the full contract price,
the building was destroyed by fire. Both Stewart and DeFrancesco
submitted claims to their respective fire insurance carriers, and
both collected insurance proceeds for the loss of the subject
property. Plaintiff State Farm General Insurance Co. (State Farm
General), DeFrancesco's insurer, brought this action against
Stewart as a purported subrogee to DeFrancesco's right to payment
from Stewart for the unpaid contract price on the apartment
building. State Farm General sought to obtain the fire insurance
proceeds which Stewart had received from her insurer, defendant
Hartford Insurance Company of Illinois (Hartford), and to enjoin
Hartford from paying Stewart those proceeds. State Farm General
later removed Hartford as a defendant in its first amended
complaint, upon learning that Hartford had already paid Stewart
on her claim. State Farm General subsequently filed a motion for
summary judgment against Stewart which the trial court granted. 
Stewart then filed a post-trial motion to vacate that order which
the trial court denied. Stewart appeals from those orders.
 The undisputed facts are as follows. On January 26, 1990,
DeFrancesco agreed to sell Stewart an apartment building located
at 5125 West Cermak Road, Cicero, Illinois. The contract between
Stewart and DeFrancesco was entitled "Real Estate Sales Contract"
in an emboldened typeface, and required Stewart to pay a $75,000
purchase price and additionally to assume the obligation to repay
a $20,000 loan against the property to the lender, Billy Eaton. 
Stewart was also required to tender a $6,000 down payment to
DeFrancesco, which she paid shortly after entering into the
contract with DeFrancesco. The contract also contained a
mortgage contingency provision and a date of closing provision,
which provided in pertinent part as follows:
 "4. This contract is subject to the condition that
 Purchaser will apply for [a] mtge within 3 months as of
 Feb 90 to pay off seller's balance ***. (Strike
 paragraph if inapplicable.)
 5. The time of closing shall be January 26, 1990
 prorated as of 2-1-90, or 20 days after notice that
 financing has been procured if paragraph 4 is operative
 *** at the office of [the] title company." (Emphasis
 in contract.)
The sales contract further provided that Stewart "agrees to pay
or satisfy the balance of the purchase price *** at the time of
closing ***." The contract also required DeFrancesco to deliver
possession to Stewart "immediately *** after the sale has been
closed." The contract also stated that DeFrancesco agrees "to
convey or cause to be conveyed *** a recordable warranty deed,
***." Upon entering the contract, DeFrancesco turned over the
trustee's deed (which he had received from Stewart in 1987, as
discussed more fully below), the keys and the rent documents to
Stewart; informed the tenants they should pay rent to Stewart;
did not lease any further units; and did not enter the premises
ever again.
 Stewart subsequently applied to the Savings of America bank
for a loan to be used to pay DeFrancesco the unpaid contract
price for the apartment building. On May 11, 1990, the day of
the fire, Stewart closed on an $80,000 loan from Savings of
America obtained to pay DeFrancesco the $69,000 unpaid balance
owing on the building under their contract. Stewart deposited
the $80,000 into her personal bank account. Stewart stated that
upon learning of the fire, her attorney advised her not to pay
DeFrancesco the balance due on the contract "until we figured out
what the insurance companies were going to do."
 Both parties carried fire insurance policies on the
property. Stewart was covered by Hartford, and DeFrancesco, by
the plaintiff, State Farm General. DeFrancesco's State Farm
General policy provided that 
 "In the event of any payment under this policy, the
 Company shall be subrogated to all the insured's rights
 of recovery against any person or organization and the
 insured shall execute and deliver instruments and
 papers and do whatever else is necessary to secure such
 rights. The insured shall do nothing after loss to
 prejudice such rights."
After the fire, State Farm General paid DeFrancesco $84,649.78
for his fire losses, an amount which represented the policy
limits plus interest. Hartford paid Stewart $130,000, for the
fire damage sustained. Stewart then repaid the $80,000 loan, and
used a portion of the $130,000 insurance proceeds to pay attorney
fees incurred in defending against other lawsuits arising from
the fire, the cost of boarding up and later demolishing the
burned building, and the Billy Eaton loan. Although she repaid
the Billy Eaton loan, Stewart did not pay the principal balance
of $69,000 left owing on the contract to the seller, DeFrancesco.
 In its second amended complaint, State Farm General claimed
that, pursuant to its payment of insurance proceeds to
DeFrancesco after the fire, it was subrogated to DeFrancesco's
contractual right to collect the $69,000 unpaid purchase price
for the property from Stewart, and that it could collect that
amount out of the insurance proceeds which she had received from
Hartford. In that regard, State Farm General alleged that
Stewart and DeFrancesco had entered into a real estate contract
on January 26, 1990 for the sale of an apartment building located
in Cicero, Illinois for $75,000, and that Stewart paid a $6,000
down payment required under the contract. The complaint further
alleged that the apartment building burned down on May 11, 1990,
and that Stewart never paid DeFrancesco the unpaid portion of the
purchase price, $69,000. State Farm General also claimed that it
paid DeFrancesco $84,649.78 after the fire, that Stewart's
insurance carrier indemnified her in an unspecified amount after
the fire, and that as DeFrancesco's subrogee, State Farm General
was entitled to $69,000 of Stewart's insurance proceeds. 
Attached to the second amended complaint as exhibits were a
subrogation receipt, which purports to subrogate Defrancesco's
rights arising out of the May 11 fire to State Farm Fire and
Casualty Insurance Company, another State Farm entity; and an
explanatory affidavit of State Farm General Claim Superintendent
Candace Armstrong regarding that subrogation receipt, both of
which are discussed more fully below.
 In her answer to the second amended complaint, Stewart
alleged that State Farm General could not be subrogated to any
rights that DeFrancesco may have had against her because she did
not cause DeFrancesco's fire losses, and moreover that
DeFrancesco had no insurable ownership interest in the property
at the time of the fire because he had transferred those
interests to Stewart when he contracted to sell her the subject
property. Stewart further alleged that DeFrancesco's State Farm
General fire loss policy did not insure him for losses arising
from Stewart's failure to pay under the Stewart-DeFrancesco
contract of sale, but only for his fire-related losses. Stewart
also denied that State Farm General was DeFrancesco's subrogee
insofar as the aforementioned subrogation receipt, attached as an
exhibit to plaintiff's second amended complaint and discussed
more fully below, designated State Farm Fire and Casualty
Insurance Company as subrogee to DeFrancesco's rights arising out
of the fire loss. Finally, Stewart denied that she held her
Hartford insurance proceeds in trust for State Farm General, and
stated that, in any event, she owed less than $69,000 to
DeFrancesco on the building sale contract.
 Attached to Stewart's answer to plaintiff's complaint was
the affidavit of DeFrancesco. In that affidavit, DeFrancesco
averred that Stewart originally conveyed the subject property to
him in 1987 by means of a trustee's deed. DeFrancesco further
stated that when he acquired the property from Stewart he assumed
the duty to make payments to Billy Eaton between 1987 and 1989. 
He also stated that on January 26, 1990, he entered into a real
estate sales contract with Stewart to transfer the property back
to her, and received a $6,000 down payment from her pursuant to
the contract. At that time, Stewart agreed to assume the Eaton
loan repayments. DeFrancesco further averred that on January 26,
1990, he turned over the title, keys and rent documents to
Stewart, informed the tenants they should pay rent to Stewart,
did not lease any further units, and did not enter the premises
ever again.
 Stewart also separately filed an affirmative defense,
wherein she alleged that title to the subject property was in a
land trust at the time of the fire, and that the records of the
Cook County Recorder of Deeds reflected that fact. She further
stated that she notified State Farm General before the May 11
fire that she "held the equitable title to the premises" in
question. Stewart also alleged that DeFrancesco therefore had no
insurable interest in the subject property at the time of the
fire, and that nevertheless, State Farm General carelessly and
without any legal obligation to do so indemnified DeFrancesco for
his loss arising from the fire. Finally, Stewart alleged that
she had paid her own insurance premiums to Hartford, that State
Farm General had not, and that therefore, State Farm General
could not claim the benefits of her Hartford policy.
 State Farm General subsequently filed its motion for summary
judgment. In that motion, State Farm General argued that by
paying DeFrancesco's fire insurance claim, it became subrogated
to DeFrancesco's contractual rights against Stewart. In support
of its motion for summary judgment, State Farm General re-
submitted the aforementioned "subrogation receipt" together with
the explanatory affidavit of State Farm General Claim
Superintendent Candace Armstrong which were attached as exhibits
to plaintiff's second amended complaint; excerpts of Stewart's
deposition testimony; the DeFrancesco-Stewart contract of sale;
and a Certificate of Insurance which reflects that Hartford
insured Stewart on the subject property for $130,000. As
discussed above, the subrogation receipt stated that DeFrancesco
had subrogated all of his rights with respect to his May 11, 1990
fire loss to the State Farm entity indicated at the top of that
receipt. In that regard, at the top of the receipt are listed
several State Farm entities with boxes next to the name of each
entity. The box next to plaintiff's name, State Farm General
Insurance Co., is not checked. Instead, the adjacent box is
checked, indicating that a different State Farm entity, "State
Farm Fire and Casualty Ins. Co.," paid DeFrancesco for his fire-
related loss and was therefore the subrogee of DeFrancesco's
rights arising out of the fire.
 The Armstrong affidavit specifies that plaintiff State Farm
General, and not some other State Farm entity, had paid
DeFrancesco for his May 11, 1990 fire loss and thereby had become
his subrogee. The affidavit purports to explain that plaintiff
State Farm General had inadvertently designated the wrong State
Farm entity, State Farm Fire & Casualty Ins. Co., on the
subrogation receipt as the entity which had paid DeFrancesco the
fire insurance proceeds.
 In her deposition, Stewart testified that she originally
acquired the subject apartment building in 1981 in a land trust,
where she held it together with certain other real estate. 
Stewart used the apartment building as collateral to secure a
loan from the aforementioned lender, Billy Eaton. Stewart stated
that in 1984, she contracted to sell the building to DeFrancesco,
and in 1987, after DeFrancesco had paid her for that building,
"deeded the property personally to Mr. DeFrancesco." In so
doing, she directed the trustee to prepare a trustee's deed to
the property for DeFrancesco, and then picked up that deed which
she then gave to DeFrancesco in exchange for an agreed upon but
unspecified cash payment and DeFrancesco's assumption of the
Eaton loan repayment obligations. Stewart stated that in late
1989 and in early 1990 she and DeFrancesco discussed her
repurchase of the property for $75,000 and her assumption of the
Eaton loan repayment obligations. She stated that they entered
into the aforementioned contract of sale on January 26, 1990 and
that she paid DeFrancesco $6,000 as a down payment. She further
testified that DeFrancesco returned the deed to her, but that her
attorney advised her not to pay DeFrancesco the unpaid balance of
$69,000 on the contract after the fire "until we figured out what
the insurance companies were going to do." Stewart also
testified that she received approximately $130,000 in insurance
proceeds from Hartford for her losses arising from the May 11
fire. Stewart further stated that between 1981 and January 26,
1990, the date on which she contracted to purchase the apartment
building from DeFrancesco, Stewart was the only individual to
hold a beneficial interest in the land trust in which the
apartment building had been held.
 In response to State Farm General's motion for summary
judgment, Stewart submitted the affidavit of an "expert witness,"
Richard Kieffer, who stated that if State Farm General had
followed the generally accepted procedures employed in the
insurance industry for the adjustment of insurance claims, it
would have known not to pay DeFrancesco on his claim because it
would have learned prior to making that payment that only
Stewart, and not DeFrancesco, had an insurable interest in the
subject property.
 The trial court granted State Farm General's motion for
summary judgment, and awarded State Farm General the amount of
$69,000. Stewart filed a post-trial motion seeking vacatur of
the trial court's summary judgment order, which was denied, and
this appeal ensued. For the reasons which follow, we reverse.
DISCUSSION:
 On appeal, Stewart contends that the trial court erred in
granting summary judgment in favor of State Farm General,
because, she urges, State Farm General cannot be subrogated to
DeFrancesco's contractual rights against her. In support,
Stewart contends that because State Farm General's insurance
payment to DeFrancesco was based on his fire losses and not upon
his contractual losses arising from Stewart's nonpayment of the
full contract price, Stewart's contractual debt to DeFrancesco
was collateral to that indemnification payment. Accordingly,
Stewart urges that State Farm General's subrogation to
DeFrancesco's rights against Stewart would be unwarranted in the
absence of an express assignment from DeFrancesco of his rights
against Stewart.
 In addition, Stewart contends that DeFrancesco had no
insurable interest in the subject property at the time of the
fire, and that therefore, State Farm General had no legal
obligation to indemnify him for his purported fire losses. Thus,
according to Stewart, State Farm General's payment to DeFrancesco
was voluntary, thereby precluding any right to be subrogated to
DeFrancesco's contractual rights against Stewart.
 The right of subrogation may be grounded in equity and may
also be founded upon an express or implied agreement. Bost v.
Paulson's Enterprises, Inc., 36 Ill. App. 3d 135, 343 N.E.2d 168
(1976). Subrogation is defined as the substitution of one
individual in the place of a claimant to whose rights he succeeds
in relation to the debt or claim asserted which he has paid
involuntarily. See generally Dix Mutual Insurance Co. v. La
Framboise, 149 Ill. 2d 314, 597 N.E.2d 622 (1992); Reich v.
Tharp, 167 Ill. App. 3d 496, 521 N.E.2d 530 (1987); Continental
Casualty Co. v. Polk Brothers, Inc., 120 Ill. App. 3d 395, 457
N.E.2d 1271 (1983); Restatement of Restitution 162 (1937)
(subrogation proper where property of one person is used in
discharging an obligation owed by another). An insurer who
indemnifies its insured for a loss may be subrogated to the
rights of the insured against the party at fault under the
equitable doctrine that the economic burden "should be shifted to
the party responsible for the loss." In re Estate of Ito, 50
Ill. App. 3d 817, 823, 365 N.E.2d 1309, 1314 (1977). See also
Central National Bank & Trust Co. v. Central Illinois Light Co.,
65 Ill. App. 2d 287, 294, 212 N.E.2d 489, 493 (1965).
 The prerequisites to subrogation are: (1) a third party
must be primarily liable to the insured for the loss; (2) the
insurer must be secondarily liable to the insured for loss under
an insurance policy; and (3) the insurer must have paid the
insured under that policy, thereby extinguishing the debt of the
third party. See generally Dix Mutual Insurance Co., 149 Ill. 2d
314, 597 N.E.2d 622; Reich, 167 Ill. App. 3d 496, 521 N.E.2d 530;
Polk Brothers, 120 Ill. App. 3d 395, 457 N.E.2d 1271; Restatement
of Restitution 162 (1937); Cecil G. King, Subrogation Under
Contracts Insuring Property, 30 Tex. L. R. 62 (1952). However,
when, as here, an insurer indemnifies its insured for property
damage and then seeks to be subrogated to the insured's
collateral contract rights against the third-party purchaser of
that property not responsible for the loss, "the extent of the
right to subrogation is *** difficult to determine *** [and t]he
fact that liability of the third party *** does not rest upon
fault makes the relative equities of the insurer much less
appealing". King, 30 Tex. L. R. at 71. See also Vance,
Insurance 134 (3rd ed. 1951); Note, Subrogation of the Insurer
to Collateral Rights of the Insured, 28 Colum. L. Rev. 202
(1928).
 There are three possible alternatives with respect to an
insurer's claim of subrogation against the contract rights of an
insured: first, a court may permit the insured to keep the
proceeds of both the insurance indemnification and the contract
price and deny subrogation; second, a court may give the insurer
the benefit of the collateral obligation; or third, a court may
give the third-party obligor the benefit of the insurance. See
generally King, 30 Tex.L.R. at 71; Note, Subrogation of the
Insurer to Collateral Rights of the Insured, 28 Colum. L. Rev. at
203. However, each alternative possesses its own deficiencies:
 "To choose the first is to contravene the sound public
 policy which dictates that the insured should not be in
 a position to profit by a loss lest he be tempted to
 cause it, or be careless to prevent it; to choose the
 second is to give the insurer a windfall, for its
 premiums represented the fair equivalent of an
 obligation it contracted to incur without knowledge ***
 of the existence of collateral remedies or an abatement
 of rates in anticipation of such; to select the third
 is to violate the classical concept of the insurance
 contract as a personal one and, to some extent, the
 cherished privilege of the underwriter to select its
 obligor and determine its own moral risk." 28 Colum.
 L. Rev. at 204.
 While there are no Illinois cases directly in point, the
decisions among the various jurisdictions are divided as to the
right of an insurer to be subrogated to an insured's collateral
contract rights. See, on the one hand, Universal Title
Insurance Co. v. United States, 942 F.2d 1311 (8th Cir. 1991);
Alabama Farm Bureau Mutual Insurance Service v. Nixon, 268 Ala.
271, 105 So.2d 643 (1958); Board of Trustees of First
Congregational Church v. Cream City Mutual Insurance Co., 255
Minn. 347, 96 N.W.2d 690 (1959), which bolster Stewart's position
that no subrogation should be permitted here. See, on the other
hand, Twin City Fire Insurance Co. v. Walter B. Hannah, Inc., 444
S.W.2d 131 (Ky. 1969) which appears to articulate State Farm
General's position that it may be subrogated to DeFrancesco's
contractual rights against Stewart notwithstanding the fact that
those rights are collateral and unrelated to State Farm General's
indemnification payment to DeFrancesco. See generally Palmer,
Law of Restitution, 23.2 (1978).
 Having reviewed these authorities, we favor the view that an
insurer who indemnifies its insured for property damage may not
be subrogated to the collateral contractual rights of the insured
against a third-party purchaser of the subject property. The
case of Board of Trustees of First Congregational Church v. Cream
City Mutual Insurance Co., 255 Minn. 347, 96 N.W.2d 690 (1959),
is in point. In Cream City, the plaintiffs, the trustees of a
religious congregation, purchased several fire insurance policies
from the defendant insurance company to cover their church
property, and later entered into a contract to sell that property
to the City of Austin, Minnesota. Prior to the buyer's payment
of the full contract price and the church's transfer of legal
title, a fire destroyed the property in question. Plaintiffs
submitted claims for their losses pursuant to the insurance
policies issued by defendant, and defendant refused payment. 
Plaintiffs then sued the defendant, who argued that the church
should not be permitted to recover twice for the same loss by
collecting both insurance proceeds and the unpaid balance on the
contract of sale. In the event that they were forced to make
payment under the policies, defendants sought to be subrogated to
any rights which plaintiffs had against the buyer of the
property.
 In holding that defendant was required to make payment to
plaintiffs under the policies and that defendant had no right to
be subrogated to any rights which plaintiffs may have had against
the buyer, the Cream City court stated as follows:
 "it is the universally accepted rule that an insurer
 may be subrogated to the insured's rights against any
 person wrongfully causing a compensable loss to the
 insured. However, there is no such agreement of
 authorities as to the right of the insurer to be
 subrogated to collateral contract rights which the
 insured has against a third person who did not cause
 the loss. In considering the asserted right of the
 insurer to subrogation to the collateral rights of the
 insured, certain conflicting considerations come into
 play. To permit the insured to keep the proceeds of
 both obligations offends public policy which frowns
 upon placing an insured in a position to profit by a
 loss which he may be tempted to cause himself or by
 carelessness fail to prevent. On the other hand, to
 give the insurer the benefit of the collateral
 obligation through subrogation ignores the plain terms
 of the insuring agreement and provides the insurer with
 a windfall. Its premiums are assumed to represent the
 fair equivalent of the obligation it contracted to
 incur without knowledge of the existence of collateral
 remedies." Cream City, 255 Minn. at 347, 96 N.W.2d at
 696.
The Cream City court concluded that the insurer would not be
relieved of its liability under its policies, nor would it be
entitled to be subrogated to the rights of the insured against
the contract buyer, simply because the seller "might have
collateral contracts with third persons which operate to relieve
the insured from the loss for which the insurer agreed to
compensate him." Cream City, 255 Minn. at 347, 96 N.W.2d at 696. 
In support, the court further noted as follows:
 "The most persuasive authority to this court is our own
 prior holding in Kahn v. American Ins. Co., 137 Minn.
 16, 162 N.W. 685. In that case it was clearly held
 that in an action upon an insurance policy insuring the
 lessee against loss to his leasehold the contract
 relation between the lessor and lessee and a settlement
 of their differences arising from a fire to the leased
 premises are matters in which the insurer has no
 concern." Cream City, 55 Minn. at 355, 96 N.W.2d at
 697.
 The position articulated in Cream City that an insurer may
not be subrogated to the collateral contract rights of its
insured is consistent with the fundamental principle, already
noted, that to be subrogated to the rights of another, an
insurer's indemnification payment to its insured must extinguish
the debt of a third party primarily liable to that insured for
his loss. See Dix Mutual Insurance Co., 149 Ill. 2d 314, 597
N.E.2d 622; Reich, 167 Ill. App. 3d 496, 521 N.E.2d 530; Polk
Brothers, 120 Ill. App. 3d 395, 457 N.E.2d 1271; Restatement of
Restitution 162 (1937); Cecil G. King, Subrogation Under
Contracts Insuring Property, 30 Tex. L. R. 62 (1952). Hence,
where an insurer is not by its indemnification payment satisfying
the obligation of the third party, the right of subrogation does
not attach. 
 Moreover, the holding in Cream City is consistent with the
decision of our Illinois Supreme Court in First National Bank v.
Boston Insurance Co., 17 Ill. 2d 147, 160 N.E.2d 802 (1959). 
Although Boston Insurance did not involve the subrogation rights
of an insurance carrier, that decision makes clear that the
obligation of an insurer to its insured remains independent of
the obligation of a third-party purchaser to the insured. In
Boston Insurance, the insured entered into a contract to sell
certain property which required a down-payment of $3,000 with the
balance of $16,000 to be paid at the time of closing. Prior to
closing, the property was destroyed by fire. Damage from the
fire was estimated to be $230,000. The insurance policies in
question together had aggregate limits of $46,750, but the
carrier refused to make payment in excess of $16,000, the amount
owing on the contract of sale at the time of the fire.
 The Boston Insurance court held that the insurance carrier
could not avoid or reduce its liability to the insured based upon
a collateral contract of sale even though the balance due for the
purchase price under the collateral sales contract was
substantially less than the value of the fire damage as surveyed
by the carrier. The court held that the purchase price in such a
collateral contract would not limit an insurer's obligation
insofar as the two obligations are wholly independent of each
other. In reaching its conclusion, the court stated as follows:
 "While it is clear that a vendee can hold a vendor to
 the terms of his contract, it is by no means clear that
 a stranger to the contract should be allowed to fix
 upon the contract price as an absolute measure of the
 value of the property.
 * * *
 [I]f [the carrier] intended to mean that recovery
 should be limited by the price fixed in an executory
 contract for the sale of the property, it would have
 been easy to say so [in the policy]." Boston
 Insurance, 17 Ill. 2d at 151-54, 160 N.E.2d at 804-06.
 As in Cream City, here, although State Farm General paid
DeFrancesco for his fire-related losses, that payment was
independent of Stewart's contractual debt to DeFrancesco insofar
as Stewart did not cause those losses. As asserted both in Cream
City and in Boston Insurance, State Farm General's liability to
DeFrancesco is wholly separate and unrelated to the obligation of
Stewart to pay the balance under the real estate purchase
contract to DeFrancesco. Therefore, State Farm General's
insurance payment to DeFrancesco cannot trigger any right to
proceed under subrogation against the land purchaser for the
purchase price. Accord Universal Title Insurance, 942 F.2d 1311;
Nixon, 268 Ala. 271, 105 So.2d 643 (holding that insurer has no
right to be subrogated to insured's collateral contractual rights
where to allow subrogation would be to excuse insurer from
obligations created by its collection of premiums). See King, 30
Tex. L. R. at 71 (permitting the insurer to be subrogated to a
contractual obligation of an insured "gives the insurer a
windfall in that its premiums did not take into consideration
such collateral remedies"). See also Grant Thornton v. Syracuse
Savings Bank, 961 F.2d 1042 (2nd Cir. 1992) (no right of
subrogation where payment made by purported subrogee to putative
subrogor discharged its own debt, not that of third party).
 State Farm General would argue that a denial of its right to
subrogate against the vendee (Stewart) would result in a windfall
to Stewart since she recovered from her own insurance carrier
(Hartford) and since she did not pay the full contract price to
DeFrancesco. This argument appears to be premised upon a theory
of unjust enrichment. To state a cause of action upon a theory
of unjust enrichment, a plaintiff must allege that the defendant
has unjustly retained a benefit to the plaintiff's detriment, and
that defendant's retention of the benefit violates fundamental
principles of justice, equity and good conscience. See generally
HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc., 131
Ill. 2d 145, 545 N.E.2d 672 (1989); F.H. Prince & Co. v. Towers
Financial Corp., 275 Ill. App. 3d 792, 656 N.E.2d 142 (1995). A
plaintiff alleging an unjust enrichment may be seeking to recover
a benefit which he gave directly to the defendant, or one which
was transferred to the defendant by a third party. HPI Health
Care Services, 131 Ill. 2d 145, 545 N.E.2d 672. To establish
that the retention of a benefit conferred upon the defendant by a
third-party constitutes an unjust enrichment, a plaintiff must
show that (1) the benefit should have been given to the
plaintiff, but the third party mistakenly gave it to the
defendant instead; (2) the defendant procured the benefit from
the third party through some type of wrongful conduct; or (3) the
plaintiff for some other reason had a better claim to the benefit
than the defendant. HPI Health Care Services, 131 Ill. 2d 145,
545 N.E.2d 672.
 In the instant case, as already discussed, State Farm
General has not established that it directly conferred any
benefit upon Stewart insofar as its indemnification payment to
DeFrancesco was collateral to Stewart's contractual debt to
DeFrancesco. Nor, for that matter, has State Farm General
established that Stewart has unjustly retained a benefit
conferred upon her by a third party, i.e., the benefit she
received from her Hartford insurance policy. State Farm General
has failed to establish that it was in any way entitled to
Stewart's Hartford insurance proceeds due to a mistake, or that
Stewart procured those proceeds through any type of wrongful
conduct. Furthermore, although the record reflects that
DeFrancesco apparently did not proceed in his own right to
recover the balance on the purchase price from Stewart, there is
nothing in the record to indicate that he did not intend to or
that he would be unable to recover the purchase price from
Stewart in the future. Thus, there is no indication that in the
absence of State Farm General's subrogation action, Stewart will
in fact retain the purchase price as well as her own insurance
proceeds.
 Stewart also contends that DeFrancesco had no insurable
interest in the subject property at the time of the fire, that
consequently, State Farm General had no legal obligation to
indemnify DeFrancesco and was therefore a volunteer. See
American National Bank and Trust Co. v. Weyerhaeuser Co., 692
F.2d 455 (7th Cir. 1982) (stating that mere stranger or volunteer
who pays a creditor on a debt for which another is bound cannot
be subrogated to the creditor's rights against the principle
debtor). In response, State Farm General argues that DeFrancesco
did have an insurable interest, citing to International Insurance
Co. v. Melrose Park National Bank, 145 Ill. App. 3d 286, 495
N.E.2d 1197 (1986), which stated that a seller's interest under
an installment agreement is analogous to that of a mortgagee
whose insurable interest in the subject property extends to the
amount of the unpaid mortgage balance. In support of its premise
that a mortgagee has an insurable interest in the subject
property limited to the amount of the unpaid debt, Melrose Park
National Bank relies upon Great-West Life Assurance Co. v.
General Accident Fire & Life Assurance Corp., 116 Ill. App. 3d
921, 452 N.E.2d 550 (1983), which in turn relies upon our supreme
court's decision in Le Doux v. Dettmering, 316 Ill. App. 98, 43
N.E.2d 862 (1942). The court in Le Doux upheld the principle
that a mortgagee has in insurable interest in a property to the
extent of the unpaid mortgage balance and that the insurer may be
subrogated to that interest against the mortgagor.
 Since we have predicated our decision on the theory that
there can be no subrogation because of the collateral nature of
the purchaser's contractual obligation, as articulated in Cream
City, we need not determine whether in fact the vendor has an
insurable interest. Thus, we need not examine the decision in
Melrose Park National Bank with respect to the insurable interest
argument. However, we should nevertheless determine whether the
holdings in both Melrose Park National Bank and in Le Doux
militate against our implementation in Illinois of the holding in
Cream City that an insurer may not subrogate to the claim of its
insured against his vendee for the real estate purchase price.
 State Farm General may well seek to contend that the
approach in Cream City is implicitly rejected in Illinois under
Le Doux v. Dettmering, 316 Ill. App. 98, 43 N.E.2d 862 (1942),
which permits subrogation by the fire insurer of a mortgagee
against the mortgagor. See also Palmer, Law of Restitution
23.4, at 367 (1978) (and citations therein). State Farm General
may wish to contend that in permitting subrogation against the
mortgagor, Le Doux in effect ignores the principle that an
insurer cannot be subrogated to the collateral contract rights of
its insured. Seemingly, this proposed contention would become
even stronger if we agree with State Farm General's argument that
there was an equitable conversion here, whereby the vendor
acquires a lien interest in the land to secure the purchase
price. See Kindred v. Boalbey, 73 Ill. App. 3d 37, 39-40, 391
N.E.2d 236, 239 (1979). In that respect, State Farm General
might argue that the vendor's interest would be analogous to that
of a mortgagee.
 However, a closer examination of the decision in Le Doux
would reveal that it is not inconsistent with the holding in
Cream City or with our holding in this case. In Le Doux, the
mortgagee initially purchased insurance "as [a] legal holder of
notes," to protect his security interest in the unpaid balance
due under the mortgage agreement. Le Doux, 316 Ill. App. at 100,
43 N.E.2d at 863. Before the mortgagor fully repaid his
indebtedness, the mortgaged property was destroyed by fire. The
mortgagee's insurer indemnified him for the unpaid balance due
under the mortgage agreement and then sought to be subrogated to
the mortgagee's rights against the mortgagor. The Le Doux court
concluded that such subrogation was permissible, stating as
follows:
 "In cases like the instant one the insurance is
 considered as a further security of the debt; and on
 the familiar principle that a surety who pays the debt
 may resort to the principal debtor for payment, the
 insurer is permitted to recover from the mortgagor." 
 Le Doux, 316 Ill. App. at 110, 43 N.E.2d at 868.
The Le Doux court reasoned that the insurance coverage obtained
by the mortgagee extended only to the unpaid indebtedness under
the mortgage agreement, and that the insurer's indemnification
payment to the mortgagee effectively satisfied the debt of the
mortgagor. See also Great-West Life Assurance Co. v. General
Accident Fire & Life Assurance Corp., 116 Ill. App. 3d 921, 452
N.E.2d 550 (1983) (stating that a mortgagee's insurable interest
is prima facie the amount mortgaged and extends solely to the
amount of the debt). Thus, in Le Doux, the sole purpose of the
insurance procured by the mortgagee was to secure payment of the
unpaid mortgage balance, and the insurance indemnification
payment to the mortgagee was in that manner directly tied and
limited to that unpaid balance.
 In contrast, here, DeFrancesco's insurance coverage with
State Farm General did not purport to have as its purpose the
protection of DeFrancesco's right to collect the unpaid contract
price from Stewart. Rather, this insurance was procured by
DeFrancesco before the property was sold to protect him from fire
loss as an ongoing owner of the property. DeFrancesco's
insurance was not designed to simply protect his interest as a
seller. In that regard, State Farm General's indemnification
payment to DeFrancesco of $84,649.78 was not limited to the
unpaid balance of the purchase price. State Farm General paid
DeFrancesco the sum of $84,649.78 despite the fact that the
actual total contract price was $75,000 and even though the
unpaid balance thereon was only $69,000, Stewart having made a
$6,000 down payment. Therefore, regardless whether the
circumstances would suffice to invoke the doctrine of equitable
conversion, the basis and rationale in Le Doux for permitting
subrogation (i.e., that the insurance coverage and resultant
indemnification payment were expressly keyed to the unpaid
mortgage balance) does not exist in the instant case.
 Here, as pointed out, there is no question that the insured
acquired his coverage from State Farm General before the sale to
Stewart. His coverage therefore was keyed to his general
ownership interest rather than to any interest in the unpaid
purchase price. Even if the doctrine of equitable conversion
would be invocable here, it would only have arisen by o